# Supreme Court of Florida

_____

No. SC12-115
_____

**TONEY DERON DAVIS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC13-424
_____

**TONEY DERON DAVIS,**
Petitioner,

vs.

**MICHAEL D. CREWS, etc.,**
Respondent.

[April 10, 2014]

PER CURIAM.

Toney Deron Davis appeals an order of the circuit court denying his motion to vacate his convictions and sentences—including a conviction for first-degree felony murder and sentence of death—filed under Florida Rule of Criminal

Procedure 3.851. Davis also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed below, we affirm the postconviction court's order and deny Davis's habeas petition.

## I. BACKGROUND

In 1995, Davis was convicted of first-degree felony murder, aggravated child abuse, and sexual battery, stemming from the murder of two-year-old Caleasha Cunningham on December 9, 1992. Davis v. State, 703 So. 2d 1055, 1056 (Fla. 1997). On appeal, this Court set out the facts of the crimes:

> On the day of the murder, the mother [Gwen Cunningham] left her child—then in good health and without injuries—in Davis's care while she ran an errand.
> Thomas Moore, an acquaintance of Davis's, testified that he arrived at the apartment at around 12:45 p.m. and that Davis answered the door with the victim draped over his arm. Moore said Davis told him Caleasha had choked on a french fry. Moore said that after he called 911 and returned to the apartment, Davis was giving the victim mouth-to-mouth resuscitation. Moore went to the hospital with Gwen Cunningham when she returned.
> Davis testified that he had left Caleasha and his friend Moore alone in the apartment at about 12:30 p.m. and went to make some phone calls. He said that when he returned, Moore was gone and Caleasha was having a seizure. He says he administered CPR, put her in the shower to revive her, and accidentally dropped her in the shower. Davis said that when Moore returned, he had him call 911. Davis said that Moore asked him not to mention that he had been with Caleasha because Moore had marijuana in his possession. Sergeant Phillips testified that Davis told him he was alone with the child.
> A neighbor, Janet Cotton, testified that she heard a child crying in Cunningham's apartment and a lot of thumping noises coming from the apartment at approximately noon. She heard Davis say in a loud,

- 2 -

angry voice, "Sit down." She said that thirty minutes after the "ruckus" ended, rescue personnel arrived.

The victim was wet, unconscious, and had blood in her mouth when she was examined in the apartment. She was naked from the waist down, although she had been fully clothed when left with Davis. Davis said that the victim was choking on a french fry and he had been trying to revive Caleasha.

The emergency-room doctor who treated the victim, Doctor DeNicola, testified that the victim was brought in at around 1:40 p.m. with bruising, swelling of the brain, and pools of blood in the skull. Doctor Whitworth, who examined the child at the request of state child welfare authorities, testified that the injuries indicated vaginal penetration by a penis, a finger, or an object. The medical examiner, Doctor Floro, testified that there was no injury to the vaginal area, but that it could have healed quickly. He said the victim had suffered four separate blows to the head, causing cerebral hemorrhage. This was the cause of death.

There was additional bruising, and there was a large collection of blood at the back of the head which was not consistent with being accidentally dropped. The child was revived but died shortly afterward on December 10, 1992.

Id. at 1056-57. At the penalty phase, the State relied on the guilt phase evidence and Cunningham read a victim impact statement. The defense called Davis's parents as mitigation witnesses.

The jury recommended the death penalty by a vote of eleven to one, and after conducting a hearing in accordance with Spencer v. State, 615 So. 2d 688 (Fla. 1993), the trial court imposed the death penalty. The trial court found two aggravating factors: (1) the murder was committed during the course of a sexual battery; and (2) the murder was heinous, atrocious, or cruel (HAC). Based on Davis's three prior convictions—which included a crime of violence—the trial

court rejected the asserted mitigating factors of "no significant prior criminal history," "good person," and "not violent." The trial court also determined that Davis's claim to be a good student was not proven and that his abstention from smoking and drinking and the circumstantial nature of the case were irrelevant. The trial court did give "some weight" to the factor of Davis's background, based on evidence that Davis was a good child, had musical talent, wrote poetry, and attended church. Davis, 703 So. 2d at 1057.

Davis raised eight claims on direct appeal: (1) it was error not to follow Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973), and Faretta v. California, 422 U.S. 806 (1975), when Davis moved to discharge counsel; (2) it was error to deny his motion for a judgment of acquittal; (3) the sexual battery conviction should be reversed; (4) it was error to admit the victim impact evidence; (5) the court erred in considering and finding HAC where the jury did not consider that aggravating factor; (6) it was error to find HAC proven; (7) it was error to find the aggravating factor that the murder was committed during the course of a sexual battery; and (8) the death penalty is disproportionate. Davis, 703 So. 2d at 1057-58. This Court determined that sufficient evidence supported the convictions, claim five was unpreserved, and that all of Davis's claims were without merit. Id. at 1058-61.

In May 1999, Davis filed a shell motion for postconviction relief with a request for leave to amend. Davis filed an amended postconviction motion in May 2004, and in July 2006, Davis filed a "Third Motion, as Amended, to Vacate Judgments of Conviction and Sentences with Special Request for Leave to Amend or Supplement." Davis's third motion asserted: (1) trial counsel was ineffective for failing to ensure that Davis received a Nelson hearing, and appellate counsel was ineffective for failing to raise this issue and ensure a complete record on appeal; (2) the State violated Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972); (3) trial counsel was ineffective for failing to investigate whether Gwen Cunningham could have been the source of the blood found on Davis and at the scene; (4) it was fundamental error to conduct voir dire prior to administering an oath to the jury; (5) it was fundamental error to conduct a pretrial conference without Davis being present; (6) trial counsel was ineffective for failing to sufficiently investigate and present evidence at the penalty phase; (7) trial counsel was ineffective for failing to conduct an adequate voir dire and exercise strikes; (8) trial counsel was ineffective for failing to object to improper evidence and argument, failing to present evidence, and arguing the wrong theory of defense; (9) Davis was denied a fair trial due to unobjected-to comments made by the prosecutor about Davis's defense; (10) Davis was denied a fair trial due to unobjected-to comments made by the prosecutor that attempted to evoke sympathy

from the jurors; (11) a previously raised claim that was abandoned in Davis's third motion; (12) Davis was denied a reliable sentencing when the jury's role was diminished in violation of Caldwell v. Mississippi, 472 U.S. 320 (1985); (13) Davis was denied a reliable sentencing when the jury's role was diminished in violation of Ring v. Arizona, 536 U.S. 584 (2002); and (14) cumulative error denied Davis a fair trial.

In 2010, the postconviction court conducted an evidentiary hearing. Davis called two of his first cousins, Felicia Cotman and Latoya Johnson Davis; his trial attorney, Charlie Adams; Dr. Edward Willey; and retired Detective Michael Earl Hallam. Davis also testified on his own behalf. In rebuttal, the State called Dr. Randall Curtis Alexander and the victim's biological father, Rickey Love. In 2011, the postconviction court entered an order denying Davis's motion for postconviction relief. State v. Davis, No. 16-1992-CF-13193-AXXX-MA (Fla. 4th Jud. Cir. Dec. 19, 2011) (PC Order).

Davis appeals the postconviction court's order. Davis contends that the postconviction court erred by denying his claims that: (1) the State violated Brady and Giglio; (2) defense counsel was ineffective for failing to present Dr. Willey; (3) defense counsel was ineffective regarding his choice of defense theory; (4) defense counsel was ineffective for failing to impeach several witnesses; (5) defense counsel was ineffective for failing to object to prosecutorial misconduct;

(6) defense counsel was ineffective for failing to investigate and present witnesses at the penalty phase; (7) defense counsel was ineffective for failing to object to comments that denigrated the role of the jury; and (8) cumulative error deprived Davis of a fair trial. In addition, Davis filed a petition for a writ of habeas corpus, asserting that appellate counsel provided ineffective assistance by: (1) failing to challenge comments made by the prosecution; and (2) failing to argue that Davis was entitled to a <u>Nelson</u> hearing based on two letters written by Davis to the trial court.

## II. MOTION FOR POSTCONVICTION RELIEF

On appeal, Davis contends that because the State violated <u>Brady</u> and <u>Giglio</u> and because Davis's trial counsel did not provide effective assistance of counsel as defined by <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the postconviction court should have vacated his convictions and sentences. Claims under <u>Brady</u>, <u>Giglio</u>, and <u>Strickland</u> each present questions of law and fact. This Court thus employs a mixed standard of review, deferring to the postconviction court's factual findings that are supported by competent, substantial evidence, but reviewing legal conclusions de novo. <u>Simmons v. State</u>, 105 So. 3d 475, 487, 499 (Fla. 2012). For the reasons explained below, we affirm the postconviction court's order.

### A. **<u>Brady</u> and <u>Giglio</u> Claims**

#### 1. **<u>Brady</u> Claims**

Davis contends that the State violated <u>Brady</u> by failing to disclose three items: (1) a note written by Detective Hallam during his investigation which stated that Cunningham had told Melissa Taylor, who was an employee of the hospital where the victim was treated, that a few days before December 9, 1992, the victim returned from her father's home with a bump on her head and vaginal bleeding; (2) a note written by an unknown author stating that employees of Happyland Daycare had reported that due to asthma and diarrhea the victim had been absent from daycare since December 3, 1992, and that in late November 1992, both the victim and her sister had experienced vaginal discharge; and (3) a report titled "Family Builders Termination Summary," dated December 22, 1992, stating that Cunningham had told a Family Builders' employee that the victim was not in daycare on December 9, 1992, due to asthma.

<u>Brady</u> requires the State to disclose material information within its possession or control that is favorable to the defense. To establish a <u>Brady</u> violation, the defendant has the burden to show that: (1) the evidence was either exculpatory or impeaching; (2) the evidence was willfully or inadvertently suppressed by the State; and (3) because the evidence was material, the defendant was prejudiced. <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). To meet the materiality prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed, the jury would have reached a

different verdict.  Id. at 289.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Way v. State, 760 So. 2d 903, 913 (Fla. 2000).

The postconviction court did not err in denying relief.  To satisfy the materiality prong of Brady, the suppressed information must either be itself admissible or "lead to admissible substantive or impeachment evidence," Hurst v. State, 18 So. 3d 975, 1001 (Fla. 2009), and the admissible evidence must then be of a nature that it undermines confidence in the jury's verdict.  Davis did not establish that he was prejudiced by the State's failure to disclose the notes or the Family Builders report.

While Taylor's statement to Detective Hallam does not fit a hearsay exception, Hallam's note about Cunningham's statement to Taylor could be used as impeachment evidence.  The note is evidence of a prior statement that was inconsistent with Cunningham's trial testimony that the victim had not bled vaginally before December 9, 1992.  See Fitzpatrick v. State, 900 So. 2d 495, 515 (Fla. 2005) ("Romines' statements made at the hospital are not hearsay because the statements were offered in evidence not to prove the truth of the matter asserted, but merely for impeachment purposes . . . .").  Davis cannot, however, establish that such impeachment would be material.

The defense argued, in part, that there was reasonable doubt about Davis's guilt because the victim may not have been the source of the blood found on Davis and at the apartment and that the victim may have been injured before being left with Davis on the morning of December 9, 1992. Cunningham testified that when she left the house on that morning, the victim appeared healthy, the bed was made, and there was no blood in the bedroom or the bathroom. A prior statement undermining Cunningham's testimony thus could have been favorable to the defense. But even if the jury disregarded Cunningham's testimony entirely, such impeachment would not be material. Overwhelming evidence established that the victim's fatal injuries must have occurred on December 9, 1992, not several days before when the victim was visiting her father.

Retired patrol sergeant Lloyd K. Phillips testified that when he arrived at the scene, he saw "fresh blood" on the bathtub, the toilet seat, and the bed. Paramedic Raymond Patrick Wade, Jr., testified that upon his arrival—approximately one minute after the 911 call—the child was "lifeless" and had a small amount of "blood coming from her vaginal canal." Evidence technician Richard Coffee testified that he was called to the crime scene around 2:30 p.m. on December 9, 1992, and that when he arrived, there were blood spots in many locations in the apartment but not in the diaper that the victim had been wearing earlier in the day. Coffee described the blood spots in the hallway as "[f]resh red." Dr. Whitworth

- 10 -

testified that when he examined the victim around 4:30 or 4:40 p.m. that day, he saw two "fresh" hemorrhages to the victim's hymen, which he opined were created "less than 12 to 18 hours prior to this examination." Dr. Whitworth similarly opined that an injury to the victim's forehead above her right eye was likely inflicted "less than 30 or 48 hours" before the examination and that an injury to the left side of the victim's head and an injury to the victim's buttock likely were inflicted no more than twenty-four to forty hours prior to the examination. When asked about an injury to the victim's head, Dr. Whitworth explained that the victim "would have lost consciousness or maybe begin to have seizures or maybe stop breathing or some combination of those symptoms, but that she would be obviously neurologically symptomatic almost immediately after injury." When asked if the victim's response to the injury could have been delayed for a period so that she could eat something, Dr. Whitworth answered, "No."

In light of this evidence of recent severe injury, any doubt about the veracity of Cunningham's testimony about the victim's health and the state of the apartment on the morning of December 9, 1992, does not undermine confidence in the jury's verdict. Davis thus has not satisfied the third prong of Brady.

As for the note reporting statements made by employees of Happyland Daycare and the Family Builders report, Davis again did not prove that he was prejudiced by any failure by the State to disclose those documents. Davis did not

establish how the items could be admissible evidence or lead to the discovery of admissible evidence. Neither the "scribbled" notes nor the report could be presented as substantive evidence because they "cannot be authenticated, the author is unknown, and there is no indication of when or under what circumstances [they were] written." Jones v. State, 998 So. 2d 573, 581-82 (Fla. 2008). The notes and report perhaps could be used to impeach Cunningham, see Pearce v. State, 880 So. 2d 561, 570 (Fla. 2004) (holding that where a witness does not distinctly admit making a prior inconsistent statement, extrinsic evidence of the prior inconsistent statement may be admitted), but as explained above, the possibility that Cunningham could be impeached does not undermine confidence in the jury's verdict.

## 2. Giglio Claims

Davis contends that the State violated Giglio by failing to correct false testimony by witnesses Olivia Williams and Janet Cotton. "By contrast to an allegation of suppression of evidence under Brady, a Giglio claim is based on the prosecutor's knowing presentation at trial of false testimony against the defendant." Mordenti v. State, 894 So. 2d 161, 175 (Fla. 2004). A Giglio violation is demonstrated when: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. Guzman v. State, 941 So. 2d 1045, 1050 (Fla. 2006). The

- 12 -

false evidence is deemed material under Giglio if there is any reasonable possibility that it could have affected the jury's verdict. Byrd v. State, 14 So. 3d 921, 925 (Fla. 2009). The State has the burden to prove that the false testimony was not material by demonstrating it was harmless. Id.

In his first Giglio claim, Davis asserts that the State knowingly allowed and failed to correct false testimony when Williams testified that she spoke with Davis around 10:30 a.m. on December 9, 1992, but that she did not speak with him again that day. This Court has held, in the context of a Giglio analysis, that "[a]mbigious testimony does not constitute false testimony." Phillips v. State, 608 So. 2d 778, 781 (Fla. 1992) (concluding that informant's testimony that he was not "a police agent" was not false because the witness's statement was "attributable to the ambiguity of the term 'agent' "). In this case, the postconviction court concluded that Williams' deposition testimony was ambiguous and thus did not demonstrate that her trial testimony was false. The postconviction court did not err in denying relief. The postconviction court's factual conclusion that Williams' testimony was not false is supported by competent, substantial evidence.

At trial, the defense called Ronald Hezekiah Gordon, Jr., who testified that on December 9, 1992, Davis came to his apartment around 12:30 p.m., asked to use the phone, and socialized with Gordon for about twenty minutes. Gordon explained that after Davis left Gordon's apartment around 12:50 p.m., Gordon

received a phone call for Davis. Gordon went to Davis's apartment around 1:15 p.m. to relay the message, at which time he saw a man running to the phone booth and Davis holding the victim. The State called Williams in rebuttal. Williams testified that on December 9, 1992, she was supposed to call Cunningham or Davis around 9:30 a.m., but she overslept, and instead Davis called her around 10 or 10:30 a.m. When asked if she had "any other contact with this defendant by telephone at all after 10:30 on that day," Williams answered that she did not. Williams explained that she did try to call Davis two more times that day—once the phone rang without being answered and the other time Cunningham's neighbor "Ron" answered.

Davis asserts that Williams' trial testimony conflicted with her pretrial deposition about the events of December 9, 1992. In her deposition, Williams testified that she spoke to Davis on the phone when he called her around 10 or 10:30 a.m., and then when she attempted to call him back, she spoke to Ron once and another time the phone rang and went unanswered. When asked if she "spoke with [Davis] only one time," Williams answered: "That's when he called me." When asked if she had "any contact with Gwen or Toney during the remainder of the day," Williams answered: "Gwen. . . . She called me and told me to come to the hospital, Caleasha was in critical condition." After stating that she went to the hospital and "stayed there all night," Williams added:

- 14 -

I stayed [at the hospital] all evening until about—it was pretty late when I got home, but it was—no, it wasn't too late because Toney called me at my apartment from jail. And he called me twice, I think. First time he called—somebody—he called someone's home and they had a three-way hookup and they hooked us up. And I—and that was the only time I talked to Toney.

Williams stated that during this conversation she accused Davis of hurting the victim, and he replied, "[S]omebody else did it, there was somebody else at that apartment, another guy."

Davis also relies on a memorandum written by prosecutor Stephen V. Bledsoe. In that memorandum, Bledsoe wrote: "Later in the evening, [Williams] received a telephone call at her home from the Defendant, who was calling from the jail. The Defendant told the witness that he did not hurt Cale[a]sha and that there was another guy at the apartment, that the Defendant had left to make a telephone call . . . ."

Davis has not proven the first two prongs of Giglio. Both in her deposition and at trial, Williams appears to have assumed that "day" referred to the daylight hours of December 9, 1992, rather than the entire twenty-four hour period that was December 9, 1992. "Day" is an ambiguous term. See Webster's Third New International Dictionary 578 (1993) (defining day as "the time of light or interval between one night and the next: the time between sunrise and sunset or from dawn to darkness" and as "the period of the earth's rotation on its axis ordinarily divided into 24 hours"). Moreover, in her deposition, Williams did not specify how late

- 15 -

she returned home from the hospital and exactly when she received a call from Davis. The record thus does not establish whether Davis's call from jail occurred late on December 9, 1992, or early on December 10, 1992. Bledsoe's summary that the call occurred "[l]ater in the evening" belies Davis's claim that the State knew precisely when the call was made. Like "day," "evening" has multiple meanings. See Webster's Third New International Dictionary 787 (1993) (defining evening as—among other definitions—"the part of the day from noon to midnight" or "the period from sunset or from the evening meal until bedtime").

In addition, any failure to clarify Williams' testimony was harmless. Testimony about Williams' second phone conversation with Davis—even if it did occur on December 9, 1992—would not have bolstered Davis's credibility. The jury would still be left with the impression—as explained below—that Davis's defense evolved after he had time to contemplate the situation.

Davis did not begin to assert that someone else harmed the victim until after his conversations with the first responders and his interview with the investigating detectives. Prior to speaking to Williams, Davis spoke to seven people in six separate statements about what happened to the victim, without ever asserting that Moore—or anyone else—was left alone with the victim. First, Moore testified that when he arrived at the apartment, Davis told him that the child had choked on a French fry and was having an asthma attack. Second, paramedic Wade testified

- 16 -

that when he arrived on the scene, Davis told him that the victim was choking. Third, Officer Phillips testified that once the victim was placed in the rescue unit, he asked Davis what happened and Davis answered that the victim had choked on a French fry and that when his friend arrived at the door, he sent his friend to call 911. Fourth, Cunningham testified that when she arrived at the hospital, Davis told her "the same thing that Mr. Moore had told" her: the victim had choked on a French fry and had an asthma attack. Fifth, Detective Hallam testified that he spoke with Davis shortly after arriving at the hospital and that Davis informed him that "he had given her some French fries for lunch and she had, apparently, choked . . . and he had attempted to dislodge the French fry and give her CPR, but when that didn't work, then he had a friend of his who had arrived later, call 911." Sixth and seventh, Detective Hallam testified that he and Detective Hickman interviewed Davis. During the interview, Davis stated that the victim "choked on a French fry, he tried to giv[e] her CPR. When that didn't work, he held her under the shower, tried to revive her." Detective Hallam further testified that during the interview, Davis stated that Moore arrived while Davis was doing CPR and that—only after the detectives specifically asked about the victim's head injury—Davis explained that he accidentally dropped her in the shower. Detective Hickman gave similar testimony regarding the interview.

The timing of Davis's accusation that Moore harmed the child also does not explain Davis's testimony that when he returned to the apartment after leaving the victim with Moore, "physically [the victim] didn't look like anything was wrong with her. She looked normal, except for she wasn't breathing." Testimony from the medical personnel who treated the victim render Davis's claim that the child appeared uninjured patently implausible.

And finally, any testimony about the timing of the Moore defense does not affect the implausibility of Davis's explanation of why he did not immediately implicate Moore. Davis implausibly testified that he promised not to inform law enforcement about Moore's presence—and thus risked implicating himself in the murder—because Moore was afraid of being charged with drug possession.

In his second Giglio claim, Davis asserts that a pretrial deposition and a law enforcement officer's field notes demonstrate that witness Janet Cotton's trial testimony was false. Again, Davis did not demonstrate that the testimony was false. As a result, the postconviction court did not err in denying relief.

At trial, Cotton testified that on December 9, 1992, her friend Celeste Wiley came to Cotton's apartment to wait until around 1:30 p.m. when Wiley's son got out of school. Cotton stated that "[a]round 12:00 o'clock" in the afternoon, "[w]e heard a lot of child crying and a lot of thumping noise" coming from the victim's apartment that lasted for about thirty minutes. Cotton described the thumping as

like "something was hitting the wall." Cotton further testified that she heard a "[v]ery loud" and "stern" "male voice" that she recognized as Davis's, saying "[s]it down." Contrary to Davis's initial brief, Cotton did not testify that the noises sounded like "someone was being slammed against a wall." Initial Brief of Appellant at 34, Davis v. State, No. SC12-115 (Fla. Mar. 18, 2013). Cotton also did not comment on whether or not Wiley heard a man's voice.

In a pretrial deposition, Wiley testified that she was visiting her friend Cotton at Cotton's apartment—which was next door to the victim's apartment—at 12 or 12:30 in the afternoon on December 8, 1992, the day before the murder. Wiley testified that she heard "some noise—beating and crying, whining" and "a lot of bumping around and banging." She explained that the crying sounded like it was coming from a child and that she did not hear an adult voice. In addition, Davis attached to his postconviction motion a set of handwritten notes by an unknown author that appear to be questions and answers from an interview with Wiley. The first question asked Wiley to attempt to recall the events of Tuesday, December 8, 1992. There is no response noted after this question. The second question asks if Wiley had "an occasion to visit w/ Ms. Cotton at her apartment on Seaboard Ave.?" There followed a series of questions and answers regarding Wiley and Cotton hearing banging and a child crying from another apartment. Then, on a separate sheet of paper, the following appears: "[Wed, Dec 9] W

- 19 -

returned to Ms. Cotton's apt, but <u>after</u> rescue & police had arrived." Davis did not, however, call any witness at the evidentiary hearing to authenticate the notes.

This record does not establish that Cotton's trial testimony was false. Wiley did not comment on December 9, 1992, in her deposition, and her statement that she was at Cotton's apartment on December 8, 1992, does not conflict with Cotton's testimony that Wiley was present on December 9, 1992. The investigative note regarding Wiley's whereabouts on December 9, 1992, also is not proof that Cotton's testimony was false. The note is vague and ambiguous. Even assuming Wiley is the "W" referenced in the note, the meaning of the note is unclear. The note states that W "returned" to Cotton's apartment after the first responders arrived, but it does not explain the duration of W's absence. The note does not exclude the possibility that Wiley could have been at the apartment around noon, as Cotton testified, left the apartment—perhaps to retrieve her son from school—and then returned later in the afternoon.

And even if Cotton's testimony that Wiley was in her apartment on December 9, 1992, was false, the State's failure to correct the testimony was harmless. As set out above, the State presented ample evidence that the victim was severely beaten on December 9, 1992—regardless of whether she was also beaten earlier in the week. In light of this evidence, there is no reasonable possibility that

the portion of Cotton's testimony about Wiley hearing noises affected the jury's guilty verdict or the trial court's finding of HAC.

### B.  Ineffective Assistance of Counsel Claims

Davis argues that the postconviction court erred by denying several of his claims of ineffective assistance of counsel.  In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial.  Strickland v. Washington, 466 U.S. 668 (1984).  As to the first prong, the defendant must establish that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id. at 687.  For the second prong, "Strickland places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different."  Wong v. Belmontes, 558 U.S. 15, 27 (2009) (quoting Strickland, 466 U.S. at 694).  Strickland does not "require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' "  Porter v. McCollum, 558 U.S. 30, 44 (2009) (quoting Strickland, 466 U.S. at 693-94).

### 1.  Dr. Edward Willey

Davis contends that the postconviction court erred in denying his claim that trial counsel was ineffective for failing to call Dr. Edward Willey as an expert witness at trial. Davis asserts that Dr. Willey's conclusion that the victim had not been sexually battered would have caused the jury to have doubts about whether a sexual battery occurred. Davis concludes that trial counsel's decision not to call Dr. Willey was based solely on a misunderstanding of the law, that the decision prejudiced him at trial, and that but for counsel's deficiency, the outcome would have been different. The postconviction court concluded that Davis proved neither deficiency nor prejudice. The postconviction court did not err.

At trial, the State presented four witnesses whose testimony tended to establish that the victim had been sexually battered. Two of the witnesses were first responders. Both testified that when they arrived at the scene, the victim was nude from the waist down, and one—a paramedic—added that the victim was bleeding from the vaginal canal. The other two witnesses were physicians who examined the victim. Dr. J.M. Whitworth, who at that time was the Executive Medical Director of Children's Crisis Center and an Associate Professor of Pediatrics at the University of Florida, examined the victim at the hospital while she was still alive. He testified that the victim had two fresh hemorrhages on the hymen consistent with penetration by an object. The other physician, Dr. Bonifacio Floro, conducted the autopsy of the victim on December 11, 1992, while

Dr. Whitworth observed. Both physicians testified that by the time of the autopsy, the injuries to the victim's hymen had disappeared. The doctors testified that they would expect this phenomena over the roughly twenty-six hour span of time before the postmortem examination because in human mucosal areas, such as the mouth and vagina, there is a rich blood supply that helps injuries to heal quickly.

At the postconviction hearing, trial counsel testified that the decision not to call Dr. Willey was strategic. Attorney Adams testified that he saw no way to reconcile Dr. Willey's contention that no sexual battery had occurred with the evidence of the victim's vaginal bleeding and injuries. He also testified that he felt that Dr. Willey would likely not be viewed as credible on the witness stand.

Dr. Willey also testified at the postconviction hearing. Dr. Willey conceded that his opinion regarding the victim's hymen injuries relied on photographs and not on an in-person examination. Despite being a forensic pathologist, not an OB/GYN or pediatric physician, Dr. Willey opined that the victim's injuries were likely the result of irritation due to poor hygiene. Additionally, Dr. Willey disagreed with the State's trial witnesses' opinions that injuries to the victim's hymen could have healed in roughly twenty-six hours, especially since the victim had been brain dead for a portion of that time. Dr. Willey cited several scholarly articles regarding the healing time necessary for genital injuries to support this assertion.

In rebuttal, the State called Dr. Randall Curtis Alexander, a professor of pediatrics and the statewide Medical Director for the Child Protection Teams in Florida. Dr. Alexander testified that he agreed with Dr. Whitworth's conclusion that the injuries described were indicative of sexual battery and further opined that physical injury in a child sexual abuse case is not common. Dr. Alexander also agreed with Dr. Whitworth's conclusion that the hemorrhages had healed by the time the autopsy was conducted. Dr. Alexander explained that "flame-shaped" hemorrhages—like the ones found on the victim—are very thin superficial injuries that are not the type to last for several days, especially in a quick healing area of the body like the vagina.

Dr. Alexander disagreed with Dr. Willey's opinion that no sexual battery occurred for several reasons. First, Dr. Alexander explained that the photographs of the victim were not of sufficient quality to reveal details that would be evident at an in-person examination. Second, Dr. Alexander distinguished the scholarly articles relied on by Dr. Willey to show that the injuries could not have healed in twenty-six hours. Dr. Alexander explained that the articles primarily addressed lacerations, not superficial hemorrhages. Third, Dr. Alexander criticized Dr. Willey's claim that healing would have stopped once the victim was brain dead. Dr. Alexander testified that healing occurs so long as there is a heartbeat and blood pressure, or else transplants would not be possible.

Davis does not argue on appeal that trial counsel erred by not investigating the medical evidence related to the sexual battery charge or by not consulting another expert. He argues only that trial counsel was ineffective for not presenting Dr. Willey. The postconviction court had discretion to credit the State's experts' opinions and to also conclude that Dr. Willey would not be a credible witness. This Court has held that "[s]o long as its decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to evidence by the trial court." Windom v. State, 886 So. 2d 915, 921 (Fla. 2004) (quoting Porter v. State, 788 So. 2d 917, 923 (Fla. 2001)). Here, competent, substantial evidence supports the postconviction court's determination that Dr. Willey was not credible. Dr. Willey based his conclusions on photographs rather than in-person examinations and admitted that he had no clinical experience in pediatrics, gynecology, or obstetrics. Additionally, the articles cited by Dr. Willey to argue that the victim's injuries could not have healed in twenty-six hours pertained to severe genital lacerations rather than superficial hemorrhages. Given this record, the postconviction court did not err in denying relief.

## 2. Theory of Defense

Davis argues that the postconviction court erred by denying his claim that trial counsel was ineffective for failing to present—as Davis's primary defense—the theory that Moore was responsible for the victim's death. The postconviction court correctly concluded that this claim was untimely and without merit.

In May 1999, Davis filed a shell motion for postconviction relief, which included general statements of law regarding counsel's obligations, but did not challenge the particular defense strategy employed by attorney Adams. Despite filing an amended motion in May 2004, Davis did not amend his postconviction motion to include a claim asserting that trial counsel performed ineffectively by having argued an accidental death theory until July 2006. Despite having roughly five years between the filing of Davis's initial motion and Davis's amended motion, postconviction defense counsel did not attempt to add the claim until 2006. In light of the lengthy opportunity that postconviction counsel had to investigate Davis's case and amend the postconviction motion, the postconviction court did not abuse its discretion by determining that Davis's claim about defense counsel's theory was untimely. See, e.g., Huff v. State, 762 So. 2d 476, 481-82 (Fla. 2000) (concluding postconviction court did not abuse its discretion by denying an amendment that raised new issues where Huff had "been given ample opportunities in the subsequent years to prepare and amend his rule 3.850 motion").

- 26 -

Davis's claim also fails on the merits. Attorney Adams made a reasonable strategic decision to argue a reasonable doubt defense rather than arguing that Moore committed the crimes.

At the postconviction evidentiary hearing, attorney Adams testified that when preparing for trial, he thought it would be a "problem" for Davis to testify and assert that Moore harmed the victim because that testimony would "create[] inconsistencies" with Davis's initial statements to law enforcement officers. Adams testified that he advised Davis not to testify because he would be cross-examined about those inconsistencies. The trial record confirms that Adams made a tactical decision not to raise the Moore defense. After the defense rested its case and the State called Williams as a rebuttal witness, the trial court gave attorney Adams an opportunity to make a record about Davis's decision not to testify. At that point, a discussion between the trial court, Adams, and Davis ensued. Davis asserted that he wished to testify and that he had additional questions that he wanted Adams to ask witnesses Moore and Williams. Davis explained that Adams "wants one defense, and I want another." Attorney Adams, in turn, stated that he had "tried to advise" his client that he makes "certain individual decisions" based on his experience in the courtroom and that there are "rules of procedure and the rules of evidence" to consider. Adams further stated: "I'm not going to ask every question that a client gives me, it's not in my plans, not my theory of the case."

Ultimately, Adams reopened the case, called Moore as a witness, and asked the questions proffered on the record by Davis. Davis then testified, which was, as Adams described the decision, "totally against my advice as his attorney."

Attorney Adams' decision to avoid raising the Moore defense was reasonable. This Court has held that trial counsel acts reasonably by deciding not to raise an incredible defense, see, e.g., Hutchinson v. State, 17 So. 3d 696, 701-02 (Fla. 2009); Dailey v. State, 965 So. 2d 38, 47 (Fla. 2007), and in this case, the totality of the circumstances shows that trial counsel had reason to believe that Davis would not make a credible witness.

Trial counsel correctly concluded that if Davis took the stand, he would be cross-examined about his prior statements. See Evans v. State, 838 So. 2d 1090, 1095 (Fla. 2002) ("Evans took the stand in his own defense, and by doing so, he placed his credibility at issue. Accordingly, the prosecution was entitled to highlight inconsistencies between Evans' testimony and other evidence in the case and to expose contradictions and improbabilities in Evans' version of events.").

Moreover, the record supports trial counsel's determination that such cross-examination would be harmful to the defense. As set out above, the State presented evidence establishing that on December 9, 1992, Davis spoke to seven people about what happened to the victim—without telling any of them that Moore was left alone with the child. All of these statements occurred before Davis told

Williams that "somebody else" harmed the victim. In addition, Davis's testimony that the victim "didn't look like anything was wrong with her" was not consistent with the first responders' descriptions of the victim's condition, and Davis's explanation for not immediately disclosing Moore's involvement was incredulous.

Given this record, it was reasonable for attorney Adams to conclude that the jury would not believe Davis's claim that Moore caused the victim's injuries. To the contrary, the evidence created the impression that Davis manufactured his defense of blaming Moore as the investigation progressed. Because attorney Adams made a reasonable strategic decision not to present the Moore defense, the postconviction court did not err in denying Davis's claim.

### 3. Cross-Examination

Davis contends that his trial counsel insufficiently cross-examined witnesses Cotton, Williams, Cunningham, and Moore. The postconviction court did not err in denying relief on these claims.

First, Davis asserts that because Cotton's trial testimony differed from what she told Detective C.L. Conn during the murder investigation, trial counsel should have attempted to impeach Cotton about what time she heard noises on December 9, 1992; whether she heard a male voice that she knew to be Davis's; whether she was concerned about the noises she heard; and whether her friend Wiley was in the

apartment that day.  Davis has failed to show that trial counsel could have impeached Cotton on these points.

Cotton testified at trial that on December 9, 1992, she began to hear a child crying at around 12 in the afternoon and that she heard a male voice, which she recognized as Davis's voice, say "[s]it down."  In her deposition, Detective Conn testified that Cotton had stated that she heard "a male voice say sit down"—without specifying who the voice belonged to—and a child crying "sometime between 11:00 and noon, she wasn't specific on the time."  The fact that Detective Conn's recollection of Cotton's answers was less specific than Cotton's trial testimony does not make the deposition and trial testimony inconsistent.  Thus, Davis did not demonstrate that trial counsel—through additional cross-examination of Cotton or by calling Detective Conn—could have impeached witness Cotton about the man's voice and the timing of the child's crying.

Davis also fails to demonstrate an inconsistency regarding Cotton's reaction to the man's voice and the crying child.  At trial, Cotton testified that it was not unusual for her to hear an adult speaking to the children next door.  In her deposition, Detective Conn stated that after hearing the child crying and the male voice, Cotton "didn't think anything else of it."  Based on this record, Davis did not demonstrate that Cotton's trial testimony expressed greater concern than Cotton expressed to Detective Conn.  Thus, Davis again failed to demonstrate that

defense counsel could have impeached Cotton by cross-examining her about her statements to Detective Conn or by calling Detective Conn to testify about her interview with Cotton.

As for whether Wiley was at Cotton's apartment on December 9, 1992, Davis has not established how defense counsel could have impeached Cotton on this point. Davis did not call any witness at the evidentiary hearing who rebutted Cotton's claim that Wiley was in the apartment on December 9, 1992, or who could explain the meaning of the unauthenticated investigative note that may have been about Wiley. Wiley's deposition is silent regarding December 9, 1992, and Detective Conn's deposition does not discuss Wiley. Accordingly, Davis has not shown that defense counsel erred by not attempting to impeach Cotton on the subject of the timing of Wiley's visit on December 9, 1992.

Second, Davis asserts that defense counsel should have used Williams' deposition to impeach her testimony that she spoke with Davis on the phone only once on December 9, 1992. This claim is without merit. As discussed above, Williams' deposition does not establish that she and Davis spoke twice on December 9, 1992. Because the deposition and trial testimony are not inconsistent, the deposition could not have been used as a prior inconsistent statement to impeach Williams under section 90.801(2)(a), Florida Statutes (1995). And while defense counsel could have called Williams as a defense witness, defense counsel

made a reasonable strategic decision not to raise the Moore defense. Accordingly, Davis has not proven that trial counsel was deficient. See Strickland, 466 U.S. at 689 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy.' " (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955))).

Third, Davis contends that defense counsel should have asked Cunningham if Davis made statements to her on the day of his arrest, or shortly thereafter, in which he blamed Moore for the victim's injuries. Davis asserts that a State discovery exhibit outlining Cunningham's likely testimony establishes that trial counsel should have known that such testimony could be elicited from Cunningham. Again, this claim is without merit because defense counsel made a reasonable strategic decision not to raise the Moore defense. See Strickland, 466 U.S. at 689.

Fourth, Davis asserts that trial counsel was ineffective for not cross-examining Moore regarding whether, prior to knocking on the door of the apartment, Moore saw Davis administering CPR to the victim. This claim is conclusively refuted by the record. After initially resting, attorney Adams—at Davis's request—reopened the defense's case and called Moore. At that time, defense counsel did question Moore "as to when and how Moore was able to witness Davis giving the victim CPR prior to calling 911, and why this fact was

<u>never</u> mentioned in his previous recitation of [the] event." Initial Brief of Appellant at 68, <u>Davis v. State</u>, No. SC12-115 (Fla. Mar. 18, 2013). Davis offers no reason why it was essential for trial counsel to raise this issue during cross-examination rather than later in the trial when Moore was called as a defense witness. Accordingly, Davis has failed to prove that trial counsel's performance was deficient.

### 4. Prosecutorial Misconduct

Davis contends that the postconviction court erred in denying his claim that trial counsel was ineffective for failing to object to misconduct by the prosecution. Davis is not entitled to relief. Davis has not demonstrated deficiency as to trial counsel's failure to object to the prosecutor's arguments based on Williams' testimony or the prosecutor's comments about the Moore defense. As for the prosecutor's brief appeal to the jurors' emotions, Davis has not demonstrated that he was prejudiced by trial counsel's lack of objection.

On appeal, Davis contends that trial counsel should have objected to the prosecutor's reliance on Williams' false testimony. In addition, Davis contends that trial counsel should have objected to a question and several arguments regarding the Moore defense. Specifically, during cross-examination, the prosecutor asked Davis: "And now you come into this courtroom and you tell the members of this jury for the very first time that Thomas Moore must have

committed this very brutal crime?" And then on several occasions during closing argument, the prosecutor argued that Davis's initial statements regarding what happened to the victim differed from his trial testimony given "two-and-half years" later. The prosecutor's arguments and question were not objectionable.

And as discussed above, Davis has not demonstrated that Williams' testimony was false. Moreover, Davis does not contend that the prosecutor misrepresented Williams' testimony during closing arguments. "The proper exercise of closing argument is to review the evidence." Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985). As a result, Davis has not established that trial counsel erred by not objecting to the prosecutor's arguments based on Williams' testimony.

Regarding the prosecutor's comments about the timing of the Moore defense, Davis relies on Davis v. Zant, 36 F.3d 1538 (11th Cir. 1994), and Jackson v. State, 933 So. 2d 1180 (Fla. 4th DCA 2006). In Zant, the prosecutor responded to the defendant's statement that codefendant Underwood had confessed by announcing to the jury that the defendant's statement was "not true"—when it was—and argued that the defendant's testimony that Underwood was guilty was the "first time in living memory" that the defendant had told that defense to anyone. 36 F.3d at 1546-47. The prosecutor also described the defendant's defense as "last minute stuff" and a "first time defense," and suggested to the jury

that defense counsel did not give an opening statement setting out defenses because "[t]hey hadn't thought them up yet." Id. at 1547-48. The Eleventh Circuit Court of Appeals reasoned that because the State had known about the defendant's theory for approximately six months before trial, the comments were error. The Eleventh Circuit stated: "Little time and no discussion is necessary to conclude that it is improper for a prosecutor to use misstatements and falsehoods." Id. at 1548.

In Jackson, the prosecutor repeatedly questioned the defendant about why he had not raised his chain-of-custody defense prior to trial:

> MR. WELLS: You were arrested May fourteenth, two thousand four, weren't you?
> DANNY JACKSON: Yes, sir.
> MR. WELLS: This is the first time you're claiming that, uh, the [eyeglasses] case that was, uh, seized, uh, is not your case. Isn't that true?
> DANNY JACKSON: I never claimed the glass case—
> MR. WELLS: You're saying you never saw that glass case before, it's not yours.
> DANNY JACKSON: That one is not mine.
> MR. WELLS: Are you saying there's a, a different case that you had?
> DANNY JACKSON: The, the case that was in my pocket was a maroon—
> MR. WELLS: Is it—
> DANNY JACKSON: —case, it was almost brand new.
> MR. WELLS: Alright, so you're talking about this brand new maroon case, uh, and this is the first time you, you're claiming that that case that was seized is not yours. Isn't that true?
> DANNY JACKSON: The, the question was never brought to my attention before.
> MR. WELLS: Well, this case has been pending since May fourteenth, two thousand four.
> DANNY JACKSON: Yes, sir.

MR. WELLS: Okay. You've had an attorney, uh, representing you that, uh, close to that time through today, haven't you?

DANNY JACKSON: I've had two.

MR. WELLS: Okay, you've had two attorneys and this is the first time on the eve of trial that you're now raising this issue about your glass case.

Jackson, 933 So. 2d at 1181. The prosecutor then addressed the newness of Jackson's defense several times in closing, stating in part:

You think that the defense attorney would, would like to cross examine the witness about, uh, where the evidence was, how he came about to have the glasses case. I submit to you that that defendant just made it up right before he decided to testify because if it happ[ened]—it was an issue before he came into court today, it would have been raised, it would have been raised by one of his two prior attorneys and it would have been raised at some point prior to this, but no. It was raised at the eleventh hour right before he realized he's getting ready to go in flames, uh, he changed his test[imony]—well, he decided to testify to a set of facts, uh, and, and put the officer's credibility at issue.

Id. at 1182. The Fourth District Court of Appeal determined that the prosecutor's questioning and argument were improper because they erroneously suggested to the jury that the defendant had a burden to raise a defense before trial. Id. at 1183.

Davis misreads Zant and Jackson to stand for the proposition that the State may never comment on the timing of a defendant's asserted defense. Rather than curtailing a prosecutor's discretion to make arguments based on the evidence presented at trial, Zant and Jackson instead addressed claims that a prosecutor intentionally misrepresented the facts of the case or mislead the jury regarding the

legal issue of a defendant's lack of burden of proof in a criminal trial. Davis cannot establish that such egregious misconduct occurred in his case.

Unlike the prosecutors in <u>Zant</u> and <u>Jackson</u>, the prosecutor in Davis's case did not intentionally misrepresent facts known to the prosecution or suggest that Davis had violated a procedural rule by not presenting his defense before trial. The prosecutor also did not suggest to the jury that Davis had never raised the defense to anyone at any time. Instead, the prosecutor commented on the fact that Davis's testimony was not consistent with the statements he had made two-and-a-half years prior and that before Davis took the stand, the defense had not presented to the jury any evidence or argument supporting the theory that Moore harmed the victim. By deciding to testify and changing the defense theory mid-trial, Davis put his credibility at issue and opened the door to the prosecutor's accurate observation that Davis had not previously raised the Moore defense during trial. Once Davis testified on direct examination that Moore committed the charged offenses and about why Davis did not immediately implicate Moore, the prosecutor was entitled to cross-examine Davis about the timing of his allegations, <u>Evans</u>, 838 So. 2d at 1095, and to use closing argument to highlight the inconsistencies and weaknesses in Davis's testimony, <u>Bertolotti</u>, 476 So. 2d at 134.

Because the prosecutor's question was not improper, defense counsel cannot be ineffective for failing to object to the question. <u>See</u> <u>Darling v. State</u>, 966 So. 2d

366, 383 (Fla. 2007) (holding counsel was not ineffective for failing to raise a meritless objection).

Next, Davis contends that trial counsel should have objected to the following statement during the State's penalty phase closing argument:

> There's nothing, Ladies and Gentlemen, that you do today that's going to ease the pain of the mother, or her children, Ashley and Juan. They're going to live with that. But one day Ashley and Juan are going to grow up and they're going to want to know what happened to Caleasha, and they're going to know what justice was done.

This Court and the Third District Court of Appeal have concluded that similar closing arguments were improper attempts to elicit the jury's sympathy. See, e.g., Johnson v. State, 442 So. 2d 185, 188 (Fla. 1983) ("Another family, perhaps you haven't become closely associated with, that is the [victim's] family, will be facing this holiday season one short."); Edwards v. State, 428 So. 2d 357, 359 (Fla. 3d DCA 1983) ("I ask you for justice both on behalf of myself and the people of the State of Florida, also on behalf of [victim's] wife and children."). Given these precedents, Davis's trial counsel would have had a legal basis to object to the argument that the victim's siblings would want to know what justice was imposed for the victim's murder.

Davis has not, however, demonstrated that he was prejudiced by trial counsel's lack of objection. In Johnson, this Court concluded that the preserved objection to the argument alluding to the victim's family did not require reversal

where it was a "single comment made at the sentencing portion of the trial in response to the testimony of the defendant's relatives in his behalf." 442 So. 2d at 188; see also Hudson v. State, 992 So. 2d 96, 113 (Fla. 2008) ("We do not consider this single isolated reference to the mental anguish of Peller's family 'so prejudicial as to taint the jury's recommended sentence' and therefore rise to the level of fundamental error.") (quoting Walls v. State, 926 So. 2d 1156, 1176 (Fla. 2006)). Here too, the reference to the victim's family was an isolated comment. The prosecutor did not dwell on the victim's family but primarily focused the closing argument on the question of whether the death sentence was appropriate in light of the circumstances of the offense and the lack of mitigating evidence.

Moreover, the emotional appeal expressed by this comment was minimal. The prosecutor argued that someday the siblings will wonder "what justice" was done. This comment can be read to suggest that either a life or a death recommendation would constitute justice. Cf. Fennie v. State, 855 So. 2d 597, 610 (Fla. 2003) (concluding that prosecutor's comments did not violate preclusion against arguments encouraging jurors to "do their duty" or to "send a message" where there was "no evidence that the prosecutor expressly exhorted the jury to return a verdict of death"). And finally, the trial court did not express sympathy for the victim's family in reaching its sentencing decision.

Given the ambiguous nature of the isolated comment, any impropriety in the argument does not undermine confidence in the jury's recommendation or the sentence. As a result, the postconviction court did not err by denying relief on this claim.

### 5. Mitigation

Davis argues on appeal that the postconviction court erred by denying several portions of his claim relating to the presentation of mitigation. Davis contends that trial counsel erred by failing to call family members such as Felicia Cotman and Latoya Johnson Davis to testify about Davis's childhood, failing to present mental health expert Dr. Harry Krop, and by arguing a "non-violence" or "nice-guy" defense theory. Initial Brief of Appellant at 84, 90, Davis v. State, No. SC12-115 (Fla. Mar. 18, 2013). The postconviction court did not err in rejecting Davis's argument.

### a. Felicia Cotman and Latoya Johnson Davis

At the penalty phase, defense counsel called Davis's parents, Clarice Lavern Davis and Alvin P. Johnson. Clarice testified that although she and Davis's father never married, they raised Davis together and Davis had a normal childhood in Richmond, Virginia. She explained that Davis was an only child—born when she was eighteen—and that both she and Davis's father worked outside the home when Davis was a child. Clarice testified that Davis sometimes skipped school but was

otherwise a good student. She further testified that Davis attended church, enjoyed sports, had a talent for writing songs and poetry, and performed his songs. She stated that Davis got along well with everyone, had many friends, abstained from drugs, and cared for his children. Alvin testified that he initially helped provide a stable home for his son in Virginia, that Davis lived with him in Florida after leaving Clarice's home, and that he never had any trouble with Davis. Alvin stated that Davis did not use drugs and that everyone in the family loved him.

In his postconviction motion, Davis alleged that trial counsel should have called additional relatives during the penalty phase who could have testified to the true circumstances of his childhood and thereby dispelled the impression that Davis had been given every opportunity to grow up to be a law-abiding citizen. In support of this allegation, Davis called two of his first cousins to testify at the postconviction evidentiary hearing.

Felicia Cotman testified that as children, she and Davis lived about fifteen minutes apart and often stayed at each other's homes on the weekends. She stated that Davis's father worked all week as a truck driver and that his mother sometimes worked, resulting in Davis being left alone frequently. Cotman described Davis as a creative but rambunctious and spoiled child, who sometimes seemed sad, but who did not drink or use drugs. Cotman described Davis's grandmother as a nurturing figure but explained that his parents "part[ied]" a lot—

including using marijuana and alcohol—even when Davis was in the house. Cotman testified that Davis's parents eventually separated and that for a while after the separation, Davis lived with his mother and her boyfriend Mike. Although she did not personally witness any abuse, Cotman heard that Mike physically abused Davis's mother during the time that Davis lived with them. Cotman further testified that after Davis's trial, his father died from alcohol-related causes. Cotman was contacted by an investigator after Davis's conviction and would have been willing to testify at the penalty phase if asked.

Latoya Johnson Davis gave similar testimony. Latoya explained that she spent much of her childhood at her grandmother's house and that Davis also frequently stayed with this grandmother and attended church with his extended family. She described Davis as a spoiled, fun person who loved music and who was like a good older brother to her. Latoya testified that Davis was close to his parents, even though they worked "all the time" and left Davis "mainly to fend for himself." Latoya stated that Davis's parents often had parties where alcohol and marijuana were used and that Davis's father, a Vietnam veteran, died from alcohol-related issues. Latoya testified that Davis was "devastated" when his parents broke up when he was a teenager and that she had heard that his mother's subsequent boyfriend physically abused her when Davis was living with the couple. Latoya

- 42 -

explained that she was contacted by an investigator after Davis's conviction and would have been willing to travel to Florida to testify on Davis's behalf.

Davis failed to establish that trial counsel's investigation was deficient. This is not a case in which defense counsel failed to investigate potential penalty phase witnesses. Both cousins testified that they were contacted by a defense investigator. While Davis contends that trial counsel erred by not contacting the cousins until after Davis's conviction, this allegation of error—standing alone—is insufficient to establish deficiency. These witnesses were relevant to the penalty phase, not the guilt phase.

Davis also failed to establish that he was prejudiced by trial counsel's decision not to call Davis's cousins. The jury was aware that Davis's young parents worked while he was a child, that they eventually separated, and that Davis was generally a well-behaved child with musical talent. Thus, Davis's cousins would have added only two new aspects to the mitigation presentation: (1) Davis's parents hosted parties involving alcohol and marijuana when Davis was a child; and (2) when he was a teenager, Davis may have observed his mother being physically abused. Davis had not demonstrated that his cousins' testimony undermines confidence in the jury's sentencing recommendation or the trial court's decision to follow that recommendation. It is not plausible that the evidence about the parties that Davis's parents hosted or speculation that Davis may have observed

his mother being abused would have caused the jury to find significantly more mitigation or would have caused the trial court to give more than "some weight" to the factor of Davis's background. Davis, 703 So. 2d at 1057.

### b. Dr. Harry Krop

Next, the postconviction court did not err in denying the portion of Davis's ineffective assistance of counsel claim related to Dr. Krop. Attorney Adams testified at the evidentiary hearing that early in the investigation of Davis's case, Adams consulted clinical psychologist Dr. Krop. He asked Dr. Krop to evaluate Davis initially for any competency or sanity issues and later for mitigation purposes. Adams explained that he decided not to call Dr. Krop due to concern that the State would ask Dr. Krop about his psychosexual evaluation of Davis and about Davis's behavior while incarcerated. Attorney Adams' decision not to call Dr. Krop is also recorded in the trial transcript. Attorney Adams informed the trial court that "after what Dr. Krop told me and we had a discussion, I decided not to use him."

The record and this Court's precedent establish that defense counsel's strategic decision was reasonable. In his pretrial deposition, Dr. Krop testified that he examined Davis on November 24, 1993, and on May 31, 1995. Dr. Krop reported that Davis was competent, showed no evidence of insanity, suffered from "slight depression" but no other mental illnesses or personality disorders, tested in

the low average to average range of intelligence, and demonstrated no cognitive deficits. Although Dr. Krop concluded that without more information, he "would not be able to comment with regard to any psychosexual disorder," Dr. Krop testified that he was aware of two past allegations of sexual misconduct with a minor and that Davis reported that he had been ordered to participate in psychosexual counseling as a condition of a prior offense. Similarly, Dr. Krop stated that he would need more information before he could offer any opinion about Davis's behavior as an inmate but noted that Davis reported that he had been twice accused of assault and battery on a law enforcement officer while incarcerated. Overall, Dr. Krop explained that if he were called to testify during the penalty phase, he would inform the jury that Davis "does not suffer from any kind of mental illness" or "any kind of significant psychological problem" and that because Davis denied committing the murder, sexual battery, and child abuse, Dr. Krop would not be able to "comment on any kind of mental state at the time of the offense."

The instant claim is similar to an issue raised in Everett v. State, 54 So. 3d 464 (Fla. 2010). In that case, this Court concluded that defense counsel made a reasonable strategic decision not to call a mental health expert who had opined that "Everett demonstrated no signs of mental retardation or of a major mental illness" because trial counsel could reasonably determine that such "testimony was not

favorable to Everett's case." Id. at 482; see also Davis v. State, 928 So. 2d 1089, 1111-12 (Fla. 2005) (concluding that trial counsel acted reasonably by not calling mental health expert who would have testified that defendant was violent but lacked any psychosis or any major mental problems). In Davis's case, Dr. Krop did not conclude that Davis suffered from any emotional, psychological, or neurological condition that could be argued to be a mitigating factor relevant to his behavior at the time of the offenses. Dr. Krop's deposition demonstrates that Dr. Krop would not have provided helpful testimony. As a result, Davis has not proven that trial counsel erred by not calling Dr. Krop.

### c. "Non-Violence" or "Nice-Guy" Defense Theory

In the third part of this appellate claim, Davis asserts that trial counsel erred by arguing " 'non-violence' as a recurring mitigation theme" and presenting evidence that Davis was a "nice guy" because this theme allowed the State to highlight the violent nature of the crimes for which he had been convicted and to question defense witnesses about Davis's criminal history. Initial Brief of Appellant at 84, 90, Davis v. State, No. SC12-115 (Fla. Mar. 18, 2013).

Davis's suggestion that defense counsel could have prevented the State from arguing during the penalty phase that the murder and sexual battery were violent crimes is without merit. These arguments were properly directed at the applicability of the HAC aggravating factor, and thus admissible under section

921.141(5)(h), Florida Statutes (1995). Counsel cannot be deemed ineffective for failing to make a meritless objection. Darling, 966 So. 2d at 383. As for Davis's past criminal offenses, the trial court and the jury heard that Davis had been convicted of three felonies because Davis—against trial counsel's advice—decided to testify during the guilt phase. Once Davis took the stand, the State was entitled to inquire about his criminal convictions, as those convictions were relevant to his credibility. See § 90.610(1), Fla. Stat. (1995). Because Davis testified against counsel's advice, it was not defense counsel's error that resulted in the admission of evidence of Davis's convictions.

### 6. Jury's Role

In his postconviction motion, Davis asserted that Florida's standard jury instructions violate Caldwell v. Mississippi, 472 U.S. 320 (1985). Unlike in his appellate brief, Davis did not argue that trial counsel was ineffective for failing to object to one of the trial court's guilt phase jury instructions and to a portion of the prosecutor's closing argument. As a result, Davis's ineffective assistance of counsel claim is not preserved for review. See Hutchinson v. State, 17 So. 3d 696, 703 (Fla. 2009).

In addition, Davis's ineffective assistance of counsel claim is without merit. Trial counsel cannot be deficient for not objecting to the instruction and the arguments because they were not improper. Davis challenges the trial court's guilt

phase jury instruction: "Your duty is to determine if the defendant is guilty or not guilty in accord with the law. It is the Judge's job to determine what a proper sentence would be if the defendant is guilty." In Combs v. State, 525 So. 2d 853, 856 (Fla. 1988), this Court determined that a substantially similar instruction that informed the jury that the "final decision as to what punishment should be imposed rests solely with the judge of this court" did not violate Caldwell. Similarly, Davis has not shown that the prosecutor improperly disparaged the role of the jury. Davis challenges the prosecutor's comment: "And let me emphasize to you, again, yours will be an advisory sentence, a recommendation to the Court, because the final decision rests with His Honor, Judge Davis, in this case." But in Gonzalez v. State, 990 So. 2d 1017, 1027 (Fla. 2008), this Court concluded that trial counsel did not err by not objecting when "the prosecutor properly stated the role of the jury as advisory as stated in the standard jury instructions."

### C. Cumulative Error

Davis is not entitled to relief as a result of cumulative error. Regarding the guilt phase, Davis did not demonstrate that he was prejudiced by the State's non-disclosure of documents that may have been used to impeach witness Cunningham. Similarly, Davis demonstrated only one potential penalty phase error—trial counsel had a legal basis for objecting to the prosecutor's closing argument

regarding the victim's siblings—which did not undermine confidence in Davis's sentences.

## III.  PETITION FOR WRIT OF HABEAS CORPUS

### A.  Ineffective Appellate Assistance Regarding Prosecutor's Comments

In his first habeas claim, Davis argues that his appellate counsel was ineffective for failing to challenge on direct appeal a question and several arguments made by the prosecution.  To preserve such a claim for appeal, trial counsel must contemporaneously object to the prosecutor's comments.  Merck v. State, 975 So. 2d 1054, 1061 (Fla. 2007).  If trial counsel does not so object, "[u]nobjected-to comments are grounds for reversal only if they rise to the level of fundamental error.  The Court considers the cumulative effect of objected-to and unobjected-to comments when reviewing whether a defendant received a fair trial." Id. (citing Brooks v. State, 762 So. 2d 879, 898-99 (Fla. 2000)).

In this case, trial counsel did not object to the question or closing arguments identified in Davis's habeas petition.  Thus, a claim on direct appeal based on those comments would succeed only if the improper comments resulted in fundamental error.  See Downs v. Moore, 801 So. 2d 906, 910 (Fla. 2001).  Fundamental error is the type of error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty or jury recommendation of death could not have been obtained without the assistance of the alleged error."  Card v. State, 803 So. 2d

613, 622 (Fla. 2001). The few comments in this case that were improper did not create fundamental error. As a result, Davis's habeas claim is without merit.

### 1. Guilt Phase Question and Arguments

### a. Great Big Conspiracy

On direct examination, Davis testified that he refused to sign a statement during his interview with Detectives Hallam and Hickson of the Jacksonville Sheriff's Office because the detectives were "not going to write down what [he was] saying, and [they were] writing down things [he was] actually not saying." Davis further testified that after he and the detectives disagreed about who was the biological father of the victim, Davis "became skeptical about what Detective Hickson was saying." The State then cross-examined Davis. As part of that cross-examination, the prosecutor asked: "This sounds like a great big conspiracy. Do you have any idea where those detectives got that information?"

Relying on Wilson v. State, 880 So. 2d 1287 (Fla. 3d DCA 2004), Davis asserts that appellate counsel should have challenged the prosecutor's statement that Davis's testimony "sounds like a great big conspiracy." In Wilson, the Third District Court of Appeal concluded that it was error for a prosecutor to ask the defendant if the State's witnesses were conspiring against the defendant, reasoning that an attorney may not ask a witness if another witness was lying and that the term "conspiring" is functionally equivalent to "lying." 880 So. 2d at 1289.

Davis's case is distinguishable from Wilson. Unlike the defendant in Wilson, Davis broached the topic of the credibility of the State's witnesses. Davis testified on direct examination that the detectives did not accurately record the interview and that he questioned Detective Hickson's veracity. Once a defendant chooses to take the stand and put his credibility at issue, the prosecution is entitled to "expose contradictions and improbabilities in [the defendant's] version of events." Evans, 838 So. 2d at 1095. As a result, once Davis raised the issue of his opinion about the detectives' credibility on direct examination, the State was entitled to ask Davis to further explain his version of the interview with the detectives and his confusion regarding the victim's parentage. Davis's objection to the State's question would be found to be without merit. As a result, Davis has not demonstrated that appellate counsel erred by not raising the issue on appeal. See Rutherford v. Moore, 774 So. 2d 637, 649 (Fla. 2000) ("Appellate counsel cannot be considered ineffective for failing to raise issues on appeal that would have been found to be meritless.").

### b. Burden Shifting

Davis asserts that on several occasions, the prosecutor improperly shifted the burden of proof by suggesting to the jury that Davis had a burden prior to trial to raise his defense that Moore committed the charged offenses. As discussed above in the context of Davis's related postconviction claim about the timing of the

Moore defense, Davis misreads <u>Zant</u> and <u>Jackson</u>. Rather than curtailing a prosecutor's discretion to make arguments based on the evidence presented at trial, <u>Zant</u> and <u>Jackson</u> instead addressed claims that a prosecutor intentionally misrepresented the facts of the case or misled the jury regarding the legal issue of a defendant's lack of burden of proof in a criminal trial.

Neither the question and arguments challenged in Davis's postconviction appeal nor the additional comments identified in his habeas petition constitute such prosecutorial misconduct. Based on the evidence presented at trial, the prosecutor argued that the defense changed its theory mid-trial and that Davis's testimony about Moore's alleged culpability was implausible. Once Davis testified on direct examination that Moore committed the charged offenses and about why he did not immediately implicate Moore, the prosecutor was entitled to cross-examine Davis about the timing of his allegations and to use closing argument to highlight the inconsistencies and weaknesses in his testimony.

Because Davis has not demonstrated that the prosecutor's questions and arguments about Davis's failure to immediately implicate Moore were improper, Davis has not demonstrated that appellate counsel erred by not challenging the above questions and arguments. See <u>Rutherford</u>, 774 So. 2d at 649.

### c. Denigration of Defense

Next, Davis asserts that appellate counsel should have argued that the prosecutor improperly denigrated Davis's defense theory, expressed her personal opinion about Davis's credibility, and belittled Davis and his defense. Davis objects to the prosecutor's comments that Davis's defense was "not true," "lies," or "silly," the prosecutor's suggestions that his account of what happened to the victim should be thrown "out the window," "would not fly today," "makes no sense," and has "changed," and the prosecutor's statements that the jury was "supposed to believe" Davis's defense, that Davis was "in la-la land," and that Davis "probably doesn't have the same wisdom as counsel does."

While a prosecutor may "not ridicule or otherwise improperly attack the defense's theory of the case," a prosecutor is permitted to suggest to the jury that "based on the evidence of the case, they should question the plausibility of the defense's theory." Valentine v. State, 98 So. 3d 44, 55-56 (Fla. 2012). In Valentine, this Court concluded that the prosecutor did not err by stating that the defense wanted the jury to "somehow" believe the defense's theory. Id. Also in that case, this Court cited with approval its prior decision Craig v. State, 510 So. 2d 857, 865 (Fla. 1987), in which this Court determined that the prosecutor's description of the defendant's testimony as "untruthful[]" or of the defendant as a "liar" was proper argument based on the evidence of the case. Valentine, 98 So. 3d at 56. See also Davis v. State, 698 So. 2d 1182, 1190 (Fla. 1997) (concluding

that prosecutor's reference to defendant's statements as "bald-faced lies" was not improper).

Under Valentine and Craig, the majority of the prosecutor's arguments were permissible expressions of the inference that Davis's statements were inconsistent with the other evidence, not derisive comments offered merely to ridicule the defense. Two comments, however, require closer examination. The prosecutor began the rebuttal closing argument by stating: "Mr. Davis doesn't have the same wisdom as counsel does with respect to knowing that an unconscious child can't choke on a French fry, because by his very two statements he obviously didn't realize that." Second, when explaining the jury instructions related to the credibility of witnesses, the prosecutor stated that Davis was "in la-la land." While the first comment was based on the evidence presented at trial, both comments were arguably "needless sarcasm." Gore v. State, 719 So. 2d 1197, 1201 (Fla. 1998); see also Izquierdo v. State, 724 So. 2d 124, 125 (Fla. 3d DCA 1998) (concluding reference to a defense as a "pathetic fantasy" was improper).

But even if improper, these comments do not constitute fundamental error—that is, error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty . . . could not have been obtained without the assistance of the alleged error." Card, 803 So. 2d at 622. The comments are less severe in degree to the guilt phase comments considered in Braddy v. State, 111 So. 3d 810 (Fla.

2012), <u>cert. denied</u>, 134 S. Ct. 275 (2013). In that case, this Court determined that comments denigrating the defense, suggesting that conviction of a lesser included offense would be a "miscarriage of justice," and arguably making a golden rule argument—considered cumulatively—"did not deprive Braddy of a fair trial." This Court reasoned that the comments "did not go to the heart of the case" and were "not of such a nature as to cause the jury to convict Braddy against the weight of the evidence." 111 So. 2d at 843-44. Here too, the comments were not critical to the jury's verdict. Indeed, in the context of Davis's shifting story, the comment added nothing to the discrediting of Davis.

### d. Davis's Veracity

Davis contends that appellate counsel should have argued that the following comment improperly suggested that the jury should convict Davis if the jury concluded that Davis lied during his testimony:

> But you also should consider, when you're thinking about lesser included offenses, Toney Davis took the witness stand and he's not telling you he didn't commit first degree murder. I committed second, or I committed manslaughter. He's telling you he didn't do anything. He is telling you your choice is not guilty, if you believe his testimony from the witness stand.
> And when you go back there you're going to be given three verdict forms. . . . What's so important about the verdict form is what I just described to you about how there's lesser included offenses underneath. . . .
> So you're going to have them written out there. And just remember, Toney Davis says, I'm not guilty.

- 55 -

"[I]t is error for a prosecutor to make statements that shift the burden of proof and invite the jury to convict the defendant for some reason other than that the State has proved its case beyond a reasonable doubt." Gore, 719 So. 2d at 1200. An argument that the jury may acquit the defendant if and only if the jury believes that the defendant is telling the truth is likewise a misstatement of Florida law. See Northard v. State, 675 So. 2d 652, 653 (Fla. 4th DCA 1996) (concluding that argument that "in order to find [the defendant] not guilty you're going to have to believe that the defendant was telling the truth" was improper). In this case, the prosecutor did not make either of these types of improper argument. The prosecutor pointed out that the State and defense both sought an all-or-nothing verdict—that neither side asserted that Davis was guilty of a lesser included offense. The prosecutor did not argue that disbelief of Davis's account was sufficient for a conviction or that belief in Davis's account was necessary for an acquittal. Because Davis has not demonstrated that the prosecutor's argument was improper—much less, that it constituted fundamental error—he has not shown that appellate counsel was deficient. See Rutherford, 774 So. 2d at 649.

### e. Arguments from Law Enforcement Testimony

Davis contends that appellate counsel should have challenged two arguments during the prosecution's closing because the arguments created an improper impression that Captain Wade and Detective Hallam did not believe that Davis was

truthful.  Again, Davis's ineffective assistance of appellate counsel claim is without merit.

First, Davis challenges the following portion of the closing argument, in which the prosecutor summarized Captain Wade's testimony:

> Captain Wade testified that when he arrived as the emergency medical technician, he came into contact with that man right there, he was loud, abrupt, agitated and defensive.  He kept asking him questions, because the answers didn't make sense to him.  He asked him, after seeing the child [lying] face down on the living room floor unconscious and lifeless, what happened?
> Man said he gave him his version of what happened, he didn't make sense.  [Sic]  So then the fellow asked him some more questions.  Did this child drown in the bathtub?  He kept asking more questions, because his responses made no sense.

Closing argument is an opportunity for the attorneys to "explicate those inferences which may reasonably be drawn from the evidence."  <u>Bertolotti</u>, 476 So. 2d at 134.  The prosecutor's argument that Captain Wade likely continued asking Davis questions about the child's condition because Davis's answers did not make sense was a reasonable inference from Wade's testimony about the conversation he had with Davis upon arriving at the apartment.

Second, the prosecutor reviewed the testimony of Detective Hallam:

> Then the detectives testified; both Frank Hallam and Tony Hickson.  They told you that they were both dispatched to investigate this case, Detective Hallam as a lead investigator.  Tony Hickson, in assisting Detective Hallam, went to the house, Hallam went to the hospital.  Hallam went to the hospital, talked to the defendant, talked to Mrs. Cunningham, talked to Mr. Moore, talked to the doctor and then after he realized that everything Toney Davis was saying was

- 57 -

totally inconsistent with what the doctors were saying, he took him
down to the Police Memorial building as a suspect in this case.

This comment was based on Detective Hallam's testimony that after speaking to the treating physicians, he "realized that the story that Mr. Davis had given [him] was nowhere near consistent [with] what the doctors were telling [him] concerning her injuries." The prosecutor was entitled to review the evidence during closing, see Bertolotti, 476 So. 2d at 134, and no objection was raised at trial or in this postconviction proceeding to Detective Hallam's opinion about the consistency of Davis's account.

Because the prosecutor's arguments were reasonable inferences from or summarizations of the evidence admitted at trial, Davis has not demonstrated that the arguments were improper or constituted fundamental error. Accordingly, Davis has not shown that appellate counsel could have raised a meritious challenge to the prosecutor's arguments

### f. Capitalizing on Janet Cotton's Testimony

In his final challenge related to the guilt phase, Davis contends that appellate counsel should have argued on appeal that the prosecutor erred by relying on false testimony from witness Cotton during the closing arguments. As explained above, Davis did not demonstrate that Cotton's trial testimony was false. As a result, he has not established that appellate counsel should have challenged the prosecutor's arguments based on Cotton's testimony.

## 2. Penalty Phase Arguments

### a. Victim's Siblings

Davis contends that appellate counsel should have challenged the prosecutor's comment that "one day Ashley and Juan are going to grow up and they're going to want to know what happened to Caleasha, and they're going to know what justice was done." As addressed in Davis's related postconviction claim, this comment was an objectionable appeal to the jurors' emotions. But for the same reasons that Davis was not prejudiced by trial counsel's failure to object to the comment, the isolated emotional appeal did not constitute fundamental error. The comment does not undermine confidence in the jury's verdict, must less vitiate the fairness of Davis's trial.

### b. Prosecutorial Expertise

Davis contends that appellate counsel should have challenged the following argument: "As we talked about in jury selection, you know the State of Florida does not seek the death penalty in every case, because it's not just proper in every case. But I submit to you, in this case, it most certainly is." Davis is correct that this prosecutorial expertise argument is improper. See, e.g., Ferrell v. State, 29 So. 3d 959, 987 (Fla. 2010); Brooks v. State, 762 So. 2d 879, 901 (Fla. 2000). But even when considered cumulatively with the prosecutor's appeal to the jurors' sympathy for the victim's siblings, this comment does not rise to the level of

fundamental error. These comments do not "reach[] down into the validity of the trial itself to the extent that a . . . recommendation of death could not have been obtained without the assistance of the alleged error[s]." Card, 803 So. 2d at 622.

The two objectionable comments in the penalty phase of this case were less egregious than those in Card, in which this Court concluded that a prosecutor's comments misleading the jury about whether the defendant would serve a life sentence, suggesting that the jurors could weigh victim impact evidence as aggravation, and urging the jury to be the "conscience of the community" "were not so prejudicial as to vitiate the entire trial." Id. at 622. Here, the prosecutor's improper statements were not numerous and the comment regarding the victim's family did not expressly ask the jurors to recommend a death sentence. In addition, the defense presented little mitigation evidence—none of which pertained to the circumstances of the offense—to be weighed against the evidence of two aggravating factors: in the commission of a sexual battery and HAC. Given this ratio of mitigation to aggravation, Davis cannot establish that the jury's recommendation could not have been obtained without the two improper penalty phase comments.

### c. Death Penalty Is Justified

Davis next objects to the prosecutor's statement: "If you find there are one or more aggravating circumstances in this case, Ladies and Gentlemen, then that

justifies the imposition of a death penalty; unless, unless you find mitigating circumstances. And take it a step further, if those mitigating circumstances outweigh the aggravating circumstances." This comment was not improper.

While a prosecutor may not argue that the jury must recommend a death sentence unless the mitigating circumstances outweighed the aggravating circumstances, see, e.g., Brooks, 762 So. 2d at 902, in the instant case, the prosecutor correctly informed the jury that a death sentence is legally permitted where the aggravating circumstances outweigh the mitigating circumstances without improperly diminishing the jury's discretion to recommend less than the legally allowable sentence. This Court has also disapproved arguments in which the prosecutor misstates Florida law by urging the jury to recommend a death sentence where the aggravating circumstances outnumber the mitigating circumstances. See, e.g., Urbin v. State, 714 So. 2d 411, 421 (Fla. 1998). But in Davis's case, the prosecutor correctly stated that the sentencing recommendation should be based on whether the aggravating factors outweigh the mitigating factors. Because Davis has not demonstrated that this prosecutorial comment was improper, he has not demonstrated that appellate counsel erred. See Rutherford, 774 So. 2d at 649.

### d. "Cries Out" for Death

Relying on Ferrell and Brooks, Davis asserts that appellate counsel should have challenged the prosecutor's argument that Davis's case "simply cries out for the death penalty because of th[e] heavy, heavy aggravating circumstance" that the murder was committed during the course of a sexual battery. This Court did not disapprove of any similar comment in Ferrell or in Brooks, and Davis offers no other authority to support his claim that this argument was improper. Because Davis did not establish that the argument was improper, he has not demonstrated that appellate counsel erred.

### e. Hold Davis Accountable

Davis asserts that appellate counsel should have challenged the prosecutor's arguments that "based on those categories of evidence," the jury will "determine whether this defendant will be held fully accountable for the crime that he's committed" and that "[j]ustice demands that [the jury] hold this defendant fully accountable for this murder." Davis is correct that this Court has concluded that it is improper for the State to tell jurors that "the only proper recommendation to this court is a recommendation of death" or that the jurors have a legal duty to recommend the "appropriate punishment" of death. See Melton v. State, 949 So. 2d 994, 1019 n.16 (Fla. 2006). Davis overlooks, however, that in Gonzalez, 990 So. 2d at 1029, this Court clarified that it is not improper for the prosecutor to tell the jury that it has a "responsibility" to recommend the death penalty where the

prosecutor informs the jury that its recommendation should be "based upon all the evidence in this case."

This Court explicated the same distinction in <u>Wade v. State</u>, 41 So. 3d 857, 870-71 (Fla. 2010), in which the prosecutor argued:

> <u>You might hear an argument about life is enough. Life is however many years he's got left and leaves that prison only when he dies. What I suggest to you is that argument tells you that this defendant should not be held fully accountable for his actions. The argument in essence says let's take the easy way out.</u> I know life is life and I know it will be a miserable life in prison and let's give him life, but that's not the law of the State of Florida. You have to weigh and weigh this aggravation and you will find that it cries out for full accountability.

This Court determined that the argument was not improper because it "correctly told the jurors that it was their duty actually to weigh the factors, [and the prosecutor] in no way implied that the jury was <u>required by law</u> to return a recommendation of death." <u>Id.</u> at 871. <u>See also</u> <u>Ford v. State</u>, 802 So. 2d 1121, 1131, 1131 n.17 (Fla. 2001) (concluding no error where prosecutor argued that "[p]eople must be held accountable for their actions").

As in <u>Gonzalez</u> and <u>Wade</u>, the prosecutor in Davis's case did not assert that the jurors had a legal duty to recommend death but instead asserted that the death penalty was appropriate due to the evidence establishing an aggravating factor. As a result, the argument was proper and appellate counsel did not err by not raising this issue on direct appeal. <u>See</u> <u>Rutherford</u>, 774 So. 2d at 649.

### f. Nonstatutory Aggravating Factor

Finally, Davis contends that his appellate counsel should have argued that the following comment was an attempt to interject into the jury's evaluation a nonstatutory aggravating factor:

> Now, we have already talked about the circumstances of the offense. You know what happened to that child and you know how it happened. And I suggest to you there is no mitigat[ion] in the circumstances of the offense . . . . I suggest to you there is nothing but aggravation, because remember this defendant tried to cover that up. She choked on a French fry and she had an asthma attack. That's what he told everybody. That's what he told the rescue captain who was frantically trying to save that child's life.
> So this defendant just in a cold-hearted way, lies and misrepresents as to what happened to that child. That's the first thing he does after committing those vicious crimes.
> Does that reflect on this defendant's character? Sure it does. It's the same answer, I submit to you, absolutely no regard for the sanctity of human life. That's all.

Penalty phase evidence of the defendant's bad acts is permissible when "offered in rebuttal to the defense, not as a nonstatutory aggravator." Zack v. State, 911 So. 2d 1190, 1208 (Fla. 2005). The challenged comments, when read in context, do not attempt to interject a nonstatutory aggravating factor into the jury's consideration. After explaining why the aggravating factor that the murder was committed in the course of a felony was applicable to this case, the prosecutor went on to address the mitigating circumstances that would likely be proposed by the defense. In doing so, the prosecutor cited Davis's lack of truthfulness to first responders as evidence rebutting the defense's theory that Davis is a good person

and Davis's testimony that he did not harm the victim.  This argument was permissible.  Accordingly, appellate counsel did not err.

## B.  Ineffective Appellate Assistance Regarding <u>Nelson</u> Hearing

On direct appeal, Davis's counsel argued that during the hearings on March 21, 1994, and April 5, 1994, the trial court "erred in not following the dictates of <u>Nelson</u> and <u>Faretta</u> when Davis moved to discharge his court-appointed counsel before trial commenced."  Merit Brief of Appellant at 9, <u>Davis v. State</u>, No. SC86,363 (Fla. Jul. 29, 1996).  This Court rejected that claim, concluding that Davis's request to discharge was ambiguous.  <u>Davis</u>, 703 So. 2d at 1058.  Davis now asserts that appellate counsel also should have argued that the trial court erred by not conducting additional <u>Nelson</u> hearings in June 1994 and June 1995 based on letters that he wrote to the trial court.  His habeas claim is without merit.

"[T]he requirements of <u>Nelson</u> depend upon a clear and unequivocal statement from the criminal defendant that he wishes to discharge counsel."  <u>Logan v. State</u>, 846 So. 2d 472, 477 (Fla. 2003).  "This Court has consistently found a <u>Nelson</u> hearing unwarranted where a defendant presents general complaints about defense counsel's trial strategy and no formal allegations of incompetence have been made."  <u>Logan</u>, 846 So. 2d at 477.  Accordingly, expressions of disagreement with trial counsel's strategy or complaints about lack of communication—as in Davis's June 1994 letter—do not give cause for a <u>Nelson</u> hearing.  <u>See, e.g.,</u>

Stephens v. State, 787 So. 2d 747, 758 (Fla. 2001). And while in his June 1995 letter, filed after the jury reached its verdict on May 11, 1995, Davis asked for a new trial due to his belief that trial counsel erred, Davis did not ask that trial counsel be discharged. Because the trial court was not required to hold a Nelson hearing based on Davis's June 1994 and June 1995 letters, appellate counsel did not err by not raising the letters on direct appeal.

IV. CONCLUSION

For the reasons stated above, we affirm the postconviction court's denial of Davis's motion for postconviction relief and deny his petition for a writ of habeas corpus.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
      Henry Elisha Davis, Judge - Case No. 92-13193-CF
      Habeas Corpus – Original Proceedings

Richard Adam Sichta, Jacksonville, Florida,

      for Appellant

Pamela Jo Bondi, Attorney General, and Stephen R. White, Assistant Attorney General, Tallahassee, Florida,

      for Appellee