# Supreme Court of Florida

_____

No. SC15-1880
_____

**STATE OF FLORIDA,**
Appellant,
Cross-Appellee,

vs.

**RAYMOND MORRISON, JR.,**
Appellee,
Cross-Appellant.

[November 16, 2017]

PER CURIAM.

This is an appeal from an order entered on Raymond Morrison, Jr.'s, postconviction motion to vacate his conviction of first-degree murder and sentence of death, and related convictions and sentences, filed under Florida Rule of Criminal Procedure 3.851. The State appeals the postconviction court's order to the extent that it granted Morrison a new guilt phase and penalty phase based on ineffective assistance of counsel. Morrison cross-appeals the postconviction court's order to the extent that it denied four of his postconviction claims and declined to conduct a cumulative error analysis. We have jurisdiction. See art. V,

§ 3(b)(1), Fla. Const. We reverse the portion of the postconviction court's order granting Morrison a new guilt phase, but we affirm the portions of the postconviction court's order granting Morrison a new penalty phase and denying Morrison's other asserted grounds for postconviction relief. We also reject Morrison's claim of guilt phase cumulative error.

## I. BACKGROUND

In 1998, Morrison was convicted of "first-degree murder for the January 8, 1997, killing of Albert Dwelle, which occurred during the course of a robbery upon Dwelle in his apartment in Duval County," and "armed robbery with a deadly weapon and burglary of a dwelling with intent to commit a battery, with an assault or battery on Dwelle." Morrison v. State, 818 So. 2d 432, 437 (Fla. 2002). On direct appeal, this Court set out the facts of the crimes:

> On January 9, 1997, the dead body of eighty-two-year-old Dwelle was found on the floor of his bedroom by service personnel from Meals on Wheels. An autopsy revealed numerous injuries on the body of Dwelle, including contusions and abrasions to the head, chest, arms, and hand. According to the medical examiner, Dwelle died from loss of blood due to two lethal knife wounds to the throat. One was a stab wound to the left side of the neck which penetrated to the depth of almost five inches, perforating the esophagus and nicking the cervical vertebrae. A second wound to the neck was described as an incised wound across the front of the throat. As a consequence, Dwelle aspirated the blood caused by the knife wounds to his neck.
> Dwelle was disabled for many years, having suffered a stroke during a bout of typhoid fever at age six or seven. He could not use his left hand or arm, he could hardly stand up and walk, and he needed assistance to bathe, dress, and cook. Meals on Wheels delivered his meals once a day.

Investigation by police revealed that Morrison had visited his girlfriend, Sandra Brown, on January 8, 1997. Brown lived at the Ramona Apartments in an upstairs apartment directly across from Dwelle's apartment. Morrison spent the afternoon of January 8, 1997, socializing with Brown and her uncle at Brown's apartment. At some point in the late afternoon or early evening, Brown and Morrison walked to the local convenience store to buy some beer. Brown paid for the beer with money she had just received for babysitting. To her knowledge, Morrison did not have any money. They returned to Brown's apartment where they drank the beer with Brown's uncle. Brown's uncle later left to return to his own home. At about 9 p.m., Morrison prepared two steaks and placed them in the oven to cook. He then told Brown that he was going to take the trash out. He did not return to Brown's apartment and was not seen again by Brown until the next day at a different location. On that occasion, Morrison apparently avoided contact with Brown, who was attempting to talk to him to find out why he had left so abruptly the previous night.

Morrison was arrested on January 10, 1997, [at approximately 3:30 p.m.] by Officer Anthony Richardson, on a warrant for failure to pay child support. Immediately upon arrest, Morrison asked Richardson if "this [his arrest] was about that old man." Richardson told him that he was being arrested for failure to pay child support but that some homicide detectives also wanted to talk to him, so Richardson was taking him to the homicide office of the Jacksonville Sheriff's Office. Richardson then advised Morrison of his constitutional rights. Morrison learned that Richardson, in addition to being a police officer, was also a pastor in a local church. On the way to the police station, Morrison and Richardson discussed religion and Morrison's need to get his life in order. Richardson then turned Morrison over to homicide detectives Terry Short and T.C. Davis.

During a lengthy interview about the Dwelle murder, Morrison told Short that he wanted to talk to Richardson again. Short paged Richardson and Richardson returned to the police station to talk with Morrison. On the morning of January 11, 1997, and following a discussion with Richardson, Morrison gave a written statement [at approximately 1:30 a.m.] detailing his involvement in the death of Albert Dwelle. The text of Morrison's written statement seen by jurors is as follows:

On Wednesday 01-08-97 at approximately 9:00 PM I had been smoking crack with Big Man. I ran out of crack and

had no money.  I went to Apt. 68 and sat on the steps.  I was drinking a beer.  I wanted a cigar.  I knocked on the door of Apt. # 64.  The man came to the door and I ask him for a cigar.  He started telling me he couldn't let me come in.  I ask for a light for the cigar he gave me.  He went back into his bed room to get me a light.  I follow him to the bed room.  He reached into his shirt pocket hanging on a chair by the bed and handed me a light.  I put the lighter back on the chair.  I saw money in the shirt pocket.  I reached over and grabbed a few bills out of his shirt pocket.  He saw me take the money.  He got a knife from somewhere and began swinging it at me.  I tried to grab him to defend myself and also not to hurt him.  I grabbed him by the arm and turned him around so he was facing away from me.  He was thrusting the knife back over his shoulders at me.  I was holding his right arm and he was still thrashing the knife trying to cut me.  While he was trying to cut me the knife accidentally cut across his throat.  I didn't know at the time that it had cut him.  I was still holding him and he got even wilder thrusting the knife and I guess he got cut again.  That's when I saw he was cut.

I laid him down on the floor and picked up the knife.  I left the apartment and went to another part of the complex where I hid the knife under a brick.

I then went to Big Mans house and got him to take me to the Chevron.  We got gas and he took me to Marietta.  When we got to Marietta I bought some drugs with the money I took from the old man.  I then went back to Ramona Park where Big Man dropped me off and he went home.  I saw my uncle Cap and I got in the car with him.  I stayed with Cap until Friday morning and continued smoking dope and drinking till then.  Police picked me up Friday after noon.

Morrison also said he took the victim's money and spent it on drugs and prostitutes.  In addition, Morrison was seen shortly after the murder attempting to sell silver coins, similar in size and appearance to coins owned by Dwelle and missing from Dwelle's apartment after the murder.  Finally, Morrison led the detectives to the knife that he said he used to kill the victim.

Id. at 437-39 (second alteration in original).

The jury unanimously recommended the death penalty by a vote of twelve to zero and the trial court sentenced Morrison to death. Id. at 439. The trial court found and gave weight to four aggravating factors: (1) Morrison was previously convicted of a felony involving the use or threat of violence to the person—great weight; (2) the murder was committed while he was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit the crime of armed robbery or burglary with an assault or both—great weight; (3) the murder was especially heinous, atrocious, or cruel—great weight; and (4) the victim of the capital felony was particularly vulnerable due to an advanced age or disability—great weight. Id. Although the trial court found no statutory mitigation, it found and gave weight to eight nonstatutory mitigators: (1) good jail conduct in that Morrison presented no danger to the police when arrested, cooperated with the police during his detention, and led police to the murder weapon—some weight; (2) there would be no parole or other release from prison from a life sentence for first-degree murder—some weight; (3) Morrison cooperated with the police—some weight; (4) Morrison abused alcohol and cocaine and most likely used the robbery proceeds to purchase more alcohol and cocaine—some weight; (5) Morrison was employed—some weight; (6) Morrison has only borderline intellectual ability, and when combined with alcohol and drug

abuse, it results in bad judgment—great weight; (7) Morrison has a positive family background and character, and assumed some responsibility for management of the home at an early age—some weight; and (8) Morrison adjusted well to incarceration, albeit with a record of an escape conviction—some weight. Id. at 439-40.

Morrison raised twelve issues on appeal: (1) whether the trial court erred in failing to adequately address Morrison's request for new counsel prior to trial; (2) whether the trial court erred in excusing a venireperson for cause because he was unsure if he would be able to vote for a death sentence if selected as a juror; (3) whether the trial court erred in sustaining the peremptory strike of venirepersons who expressed some opposition to the death penalty, but who were not excusable for cause; (4) whether the prosecutor's remarks to the venire improperly minimized the State's burden of proof so as to violate Morrison's rights to a fair trial and to due process of law; (5) whether the prosecutor's remarks made during closing argument improperly shifted the burden of proof to the defense; (6) whether Morrison's statements to police, induced by a law enforcement officer's appeal to Morrison's religious beliefs, were voluntary, such that the trial court did not err in denying Morrison's motion to suppress; (7) whether the trial court erred in sustaining the State's objection to a question purportedly seeking to impeach the State's witness for having a self-interest; (8) whether the trial court improperly

excluded testimony intending to impeach the State's witness based on an alleged reputation for dishonesty; (9) whether the trial court erred in denying Morrison's motion for judgment of acquittal as to first-degree murder and burglary; (10) whether the heinous, atrocious, or cruel aggravating circumstance statute is unconstitutionally vague and, therefore, its application in this instance is in error; (11) whether the statute and instruction for the aggravating circumstance that the victim of the capital felony "was particularly vulnerable due to advanced age or disability" is unconstitutionally vague and its application, in this instance, is an error; and (12) whether the imposition of the death penalty in this case is proportionate. Id. at 440 n.1. This Court affirmed Morrison's convictions and sentences. Id. at 458.

On September 18, 2003, Morrison timely filed his motion for postconviction relief. On March 28, 2014, Morrison filed an amended postconviction motion raising eleven claims, many of which contained numerous subparts: (1) Morrison was denied the effective assistance of counsel at the guilt phase; (2) the State withheld evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963); (3) Morrison was denied the effective assistance of counsel at the penalty phase; (4) newly discovered evidence establishes that Morrison's conviction and sentence violate the Constitution; (5) Morrison's death sentence violates the constitutional prohibition against cruel and unusual punishment because he is intellectually

disabled; (6) the State intentionally destroyed exculpatory evidence; (7) counsel was ineffective for failing to ensure that Morrison had expert psychiatric assistance at the guilt phase and penalty phase; (8) counsel was ineffective for failing to object to the State's nonstatutory aggravators; (9) counsel was ineffective for failing to object to Morrison's absence from critical stages of the trial; (10) the trial court erroneously allowed the jury to hear evidence of a prior felony; and (11) cumulative error requires a new guilt phase and penalty phase. The postconviction court held an evidentiary hearing regarding Morrison's first nine claims on January 12-15, February 17-20, and March 18-19, 2015. Numerous lay and expert witnesses were presented during the ten-day evidentiary hearing.

On September 18, 2015, the postconviction court entered an order granting Morrison a new guilt phase and penalty phase based on some of his claims of ineffective assistance of counsel, namely, subparts of claims one and three. State v. Morrison, No. 16-1997-CF-00991-AXXX-MA (Fla. 4th Cir. Ct. Sept. 18, 2015) (Postconviction Order). The postconviction court denied all of Morrison's remaining claims except for his claim of cumulative error, which it declined to rule on because it was granting Morrison a new trial. Id.

On appeal, the State argues that the postconviction court erred in finding that: (1) trial counsel was ineffective for failing to adequately challenge Morrison's written statement to the police detailing his involvement in the death of the victim;

- 8 -

(2) trial counsel was ineffective for failing to adequately investigate and prepare for the guilt phase; and (3) trial counsel was ineffective for failing to adequately investigate and prepare for the penalty phase. On cross-appeal, Morrison argues that the postconviction court erred by denying his claims that: (1) the State withheld evidence in violation of <u>Brady</u>; (2) newly discovered evidence establishes that Morrison's conviction and sentence violate the Constitution; (3) Morrison's death sentence violates the constitutional prohibition against cruel and unusual punishment because he is intellectually disabled; and (4) trial counsel was ineffective for failing to challenge the prior violent felony aggravator during the penalty phase. In his fifth claim on cross-appeal, Morrison argues that he is entitled to a new guilt phase and penalty phase under a cumulative error analysis. Because we conclude that Morrison is entitled to a new penalty phase on the basis that trial counsel was ineffective for failing to adequately investigate and prepare for the penalty phase, we decline to address claim four of Morrison's cross-appeal or his claim of penalty phase cumulative error.

## II. THE STATE'S APPEAL

### A. Ineffective Assistance of Counsel Regarding Morrison's Written Statement to the Police

The first issue presented in the State's appeal is whether the postconviction

court erred in finding that trial counsel Ronald Higbee and Refik Eler[1] were ineffective for failing to adequately challenge the voluntariness and reliability of Morrison's written statement to the police detailing his involvement in the death of the victim. Specifically, the postconviction court found that trial counsel were deficient for failing to investigate Morrison's: (1) mental health at the time of the interrogation through mental health experts; (2) crack cocaine use within hours of his interrogation; and (3) propensity to take the blame for crimes he did not commit. The postconviction court further found that the failure to present such evidence at the motion to suppress hearing and the guilt phase resulted in prejudice. As explained below, the postconviction court erred in granting relief on Morrison's ineffective assistance of counsel claim regarding his written statement to the police.

In order to obtain relief on a claim of ineffective assistance of counsel, "a defendant must establish deficient performance and prejudice." Gore v. State, 846 So. 2d 461, 467 (Fla. 2003). Under the first prong, "the defendant must show that . . . counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984). "A fair assessment of attorney

---

1. Higbee represented Morrison at the motion to suppress hearing and Eler represented Morrison at the guilt phase and the penalty phase.

- 10 -

performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. "[I]t is axiomatic that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " Hurst v. State, 18 So. 3d 975, 1008 (Fla. 2009) (quoting Strickland, 466 U.S. at 691). Under the second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

> It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, . . . and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.

Id. at 693. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

Prior to the guilt phase, Morrison filed motions to suppress his statements to police as well as evidence discovered as the result of the interrogation by police about the victim's murder. Morrison contended that the interrogation by Detectives Short and Davis was unconstitutional because it continued after

- 11 -

Morrison invoked his right to silence and his right to counsel and because his statements were obtained as the result of coercion, including the State's improper use of religion. An evidentiary hearing was conducted on November 13, 1997, regarding Morrison's motions to suppress. Morrison, Officer Richardson (a police officer and a pastor), Detective Short, Detective Davis, and Georgia Morrison (Morrison's mother) testified at the hearing, and Morrison and the State later introduced a stipulation regarding the testimony that Reginald "Fred" Austin (Morrison's uncle) would have presented at the hearing. Morrison testified at the hearing that he knew and understood his rights at the time of the interrogation and that he did not have any drugs or alcohol for thirteen hours prior to his arrest. Detectives Davis and Short testified at the hearing that they did not detect that Morrison was impaired or under the influence of alcohol or drugs at the time of his interview.

The trial court subsequently issued its order denying the motion to suppress statements made to Detective Short (which included Morrison's written statement to the police), granting the motion to suppress statements made to Officer Richardson, and denying the motion to suppress the physical evidence. The trial court found in its order that Morrison never asked for an attorney, Morrison did not state or indicate that he did not wish to talk to Detective Short, the statements made to Detective Short were not the product of intimidation, Morrison gave the

statements almost twenty-four hours after he last consumed alcohol or cocaine, and Morrison's behavior from the time of his arrest to the time he gave the statements showed that he was sober and rational. The trial court further found that the statements were made after a valid waiver of Miranda[2] rights.

At the postconviction evidentiary hearing, Morrison presented the expert testimony of Dr. Hyman Eisenstein and Dr. Joseph Wu to address, in part, his mental health at the time of the interrogation. Dr. Eisenstein, a neuropsychologist, diagnosed Morrison with organic brain damage, intellectual disability, and a substance abuse disorder. Dr. Eisenstein found that Morrison's substance abuse, brain injuries, and premature birth contributed to his organic brain damage. Dr. Eisenstein also concluded that Morrison's substance abuse impairs his cognitive abilities and that Morrison would admit to crimes he did not commit. Dr. Wu, a psychiatrist, testified regarding a PET scan of Morrison's brain and found that he had abnormal brain metabolism consistent with someone who likely has significant impairment on IQ. Dr. Wu also found that Morrison had an abnormal pattern to his frontal lobe consistent with a head injury.[3] Morrison presented the testimony of

---

2. Miranda v. Arizona, 384 U.S. 436 (1966).

3. Dr. Prichard—the State's expert psychologist—acknowledged Morrison's substance abuse problem. However, Dr. Prichard found that Morrison was not intellectually disabled and did not suffer from mental illness.

Delores Tims (Morrison's acquaintance) in support of his crack cocaine use within hours of his interrogation. Tims testified that Morrison was using crack cocaine at the time of his arrest on January 10, 1997. Morrison also presented the testimony of Joseph Turner (Morrison's friend) and Terry Heatly (Morrison's cousin) in support of his propensity to take the blame for others' crimes. Turner testified that Morrison previously "confessed to a crime [he] did not commit," and Heatly testified that Morrison "would hold drugs for drug dealers and admit the drugs were his when the police came around."

We conclude that the postconviction court's finding of prejudice conflicts with the legal standard for prejudice established in Strickland. As explained previously, the postconviction court found that trial counsel were deficient for failing to investigate Morrison's mental health at the time of the interrogation, crack cocaine use within hours of his interrogation, and propensity to take the blame for crimes he did not commit. The postconviction court ultimately concluded that Morrison was prejudiced by trial counsels' deficient performance because "[i]t is reasonable to find this evidence, had it been presented, could have changed the outcome of the proceedings." (Emphasis added.) However, the postconviction court's finding of prejudice is inconsistent with the second prong of Strickland, which requires "[t]he defendant [to] show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

- 14 -

proceeding <u>would</u> have been different." <u>Strickland</u>, 466 U.S. at 694 (emphasis added). <u>Strickland</u> defined "a reasonable probability" as "a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

The postconviction court did not determine whether the evidence presented at the postconviction evidentiary hearing would have led the trial court to suppress or the jury to disregard Morrison's written statement to the police had that evidence been presented at the motion to suppress hearing and the guilt phase. Therefore, before considering whether Morrison was prejudiced under <u>Strickland</u> by trial counsels' alleged deficient performance, we first determine whether Morrison has shown that the presentation of such evidence at the motion to suppress hearing and the guilt phase would have led the trial court to suppress or the jury to disregard Morrison's written statement.

Morrison has not shown that the evidence presented at the postconviction evidentiary hearing would have led the trial court to suppress or the jury[4] to disregard Morrison's written statement to the police as involuntary. "In examining whether a defendant's confession may be used as evidence against him, '[t]he test

_____

4. During the guilt phase, Morrison argued to the jury that his written statement was involuntary and the trial court instructed the jury that the statement should be disregarded if it determined that the statement was not freely and voluntarily made. <u>Cf.</u> <u>McDole v. State</u>, 283 So. 2d 553, 554 (Fla. 1973) ("[A] jury may still find a confession to have been involuntary and disregard it, despite a judge's finding that it was voluntary.")

is . . . one of voluntariness, or free will, which is to be determined by an examination of the totality of the circumstances surrounding the confession.' " Baker v. State, 71 So. 3d 802, 814 (Fla. 2011) (alterations in original) (quoting Owen v. State, 862 So. 2d 687, 695 (Fla. 2003)). "Moreover, '[t]o establish that a statement is involuntary, there must be a finding of coercive police conduct.' " Id. (alteration in original) (quoting Schoenwetter v. State, 931 So. 2d 857, 867 (Fla. 2006)). "Thus, whether a confession is admissible depends on (1) whether the interrogating officers engaged in coercive activity, and (2) whether that activity was sufficient to overcome the free will of the defendant." Id. "[T]he salient consideration in an analysis of the voluntariness of a confession is whether a defendant's free will has been overcome." Blake v. State, 972 So. 2d 839, 844 (Fla. 2007) (alteration in original) (quoting Black v. State, 630 So. 2d 609, 614-15 (Fla. 1st DCA 1993)). The ultimate issue of voluntariness is a legal rather than factual question. McCloud v. State, 208 So. 3d 668, 677 (Fla. 2016).

A review of the totality of the circumstances here confirms that Morrison voluntarily gave the written statement to the police. Morrison's written statement was not the product of improper coercion. Morrison was not threatened[5] or

---

5. Morrison was not threatened or intimidated by Detective Davis. The trial court found that during the interrogation, Detective Davis hit the table where Morrison was seated with his hand and shouted at Morrison, calling him a liar and accusing him of the victim's murder. Morrison responded to that outburst by

- 16 -

mistreated during the interrogation, and the police did not make any promises[6] to Morrison in exchange for his written statement. Although the police appealed to Morrison's religious beliefs, we conclude that their appeals were not so coercive as to render his written statement involuntary.[7] As the trial court found following the motion to suppress hearing, Morrison gave the written statement after validly waiving his Miranda rights. Morrison was advised of his Miranda rights at the time of arrest. Morrison was also advised of his Miranda rights when he arrived at the police station. At that time, Morrison signed a standard form attesting to the fact that he had been advised of his Miranda rights. Morrison was also reminded of his Miranda rights before he gave the written statement to the police. Although Morrison presented testimony at the postconviction evidentiary hearing regarding

---

telling Detectives Davis and Short that he would no longer talk to Detective Davis. Detective Davis left the room at that point and never again interrogated Morrison.

6. Although Officer Richardson may have indicated a possibility that the detectives would go easier on Morrison if he told the truth, this does not amount to a promise in exchange for his written statement. See Blake, 972 So. 2d at 844 ("Before finding the confession inadmissible, Florida courts have repeatedly required that the alleged promise 'induce,' be 'in return for,' or be a 'quid pro quo' for the confession.").

7. Officer Richardson provided religious counsel to Morrison, advised him to tell the truth regarding the murder of the victim, prayed with him, and agreed to keep confidential a conversation that he had with Morrison. Morrison's statements to Officer Richardson were ultimately suppressed. After Morrison broached the topic of religion during the interview, Detective Short offered to take Morrison to the chapel at the police station to pray and Morrison accepted that offer.

his mental health, the evidence is that Morrison clearly knew and understood his rights at the time of the interrogation, and Morrison has not shown otherwise. Morrison never asked for an attorney or stated or indicated that he did not wish to talk to Detective Short. Even accepting Tims' testimony, Morrison gave the written statement at least ten hours after he last consumed alcohol or cocaine and Morrison's behavior from the time of his arrest to the time he gave the written statement showed that he was sober and rational. Morrison never testified at the motion to suppress hearing or at the postconviction proceedings that he confessed to the police and was taking the blame for others, which would have contradicted his own testimony at the motion to suppress hearing that "he did not provide any inculpatory statements to [the] police." Morrison, 818 So. 2d at 446. In any event, the testimony presented at the postconviction evidentiary hearing regarding Morrison's purported propensity to take the blame for others' crimes does not establish that Morrison did so in this case or render Morrison's written statement involuntary under the totality of the circumstances presented.

Nor has Morrison shown that the evidence presented at the postconviction evidentiary hearing would have led the jury to disregard his written statement as unreliable. Morrison's written statement established that he knew the location of the murder weapon, which is consistent with the significant fact that "Morrison led the detectives to the knife that he said he used to kill the victim," id. at 439, and the

State presented evidence at trial that blood located on the blade of the knife matched the DNA of the victim. Morrison's written statement established that he knew that the victim's throat was sliced and stabbed with the victim's own knife, which was consistent with the evidence presented at trial. See id. at 437-39, 452. Morrison's written statement indicated that he went to the victim's apartment sometime after 9 p.m. on January 8, 1997. See id. at 438. Consistent with the written statement, Sandra Brown (Morrison's girlfriend) placed Morrison near the scene of the crime on the night of the murder. See id. Morrison's written statement also indicates that he stole money from the victim, which is consistent with the fact that "Morrison was seen shortly after the murder attempting to sell silver coins, similar in size and appearance to coins owned by [the victim] and missing from [the victim's] apartment after the murder." Id. at 439. Furthermore, immediately upon arrest, Morrison asked if the arrest "was about that old man." Id. at 438.

Under these circumstances, Morrison cannot demonstrate prejudice such that our confidence in the outcome is undermined. We therefore reverse the postconviction court's granting of a new guilt phase on this issue.

### B. Ineffective Assistance of Counsel Regarding Trial Counsel's Guilt Phase Investigation

The second issue presented in the State's appeal is whether the postconviction court erred in finding that trial counsel Eler was ineffective for

- 19 -

failing to adequately investigate and prepare for the guilt phase. Specifically, the postconviction court found that trial counsel was deficient for failing to adequately investigate: (1) an alibi defense; (2) the State's timeline; (3) a voluntary intoxication defense; and (4) the victim's relationship with Brown. Of these four subclaims, the postconviction court only found that trial counsel's failure to present evidence at the guilt phase regarding the voluntary intoxication defense resulted in prejudice. We conclude that the postconviction court erred in granting relief on Morrison's ineffective assistance of counsel claim regarding trial counsel's guilt phase investigation.

At the postconviction evidentiary hearing, Morrison presented the testimony of Raymond Seels (Morrison's friend), Gilda "Gillis" Payton (Morrison's friend), Austin, and Charlene Wright (Morrison's acquaintance) in support of his alibi defense. These witnesses testified that they saw Morrison in Marietta at or about the time Brown placed Morrison at the scene of the crime. In order to challenge the State's timeline, Morrison presented evidence that Isaia Medina (the victim's neighbor) heard noises "like a chair or piece of furniture being moved" coming from the victim's apartment prior to the murder at approximately 7 p.m. rather than 9 p.m. Morrison presented the testimony of a number of witnesses in support of his voluntary intoxication defense. Austin, Payton, Tangy Allen (Morrison's former fiancée), Turner, Heatly, and Raymond Morrison, Sr. (Morrison's father),

collectively testified that Morrison used alcohol and drugs on January 8, 1997, and had a history of alcohol and drug abuse. Dr. Eisenstein diagnosed Morrison with a substance abuse disorder and opined that Morrison's substance abuse compromised his cognitive abilities. Finally, in order to challenge the victim's relationship with Brown, Morrison presented the testimony of Tims and Wright.[8] Tims testified that Brown exchanged sexual favors with the victim in return for beer and cigarettes, and Wright testified that Brown used to buy beer and cigarettes for the victim.

We conclude that the postconviction court failed to conduct a proper Strickland analysis. As explained previously, the postconviction court found that trial counsel was deficient for failing to adequately investigate an alibi defense, the State's timeline, a voluntary intoxication defense, and the victim's relationship with Brown. The postconviction court only found that trial counsel's failure to present evidence at the guilt phase regarding the voluntary intoxication defense resulted in prejudice. Nevertheless, the postconviction court granted Strickland relief on all four subclaims even though it did not make a finding of Strickland prejudice regarding three of the subclaims. The postconviction court's Strickland analysis also failed to take into consideration Morrison's written statement to the police. As explained previously, the postconviction court erred in granting relief

_____

8. Brown testified at trial that although she had seen the victim, her neighbor, she did not know his name.

- 21 -

on Morrison's ineffective assistance of counsel claim regarding his written statement to the police.

Regardless, even assuming that trial counsel's investigation was deficient, Morrison has failed to demonstrate prejudice because there is no reasonable probability that the presentation of the alibi witnesses, evidence that Medina heard noises coming from the victim's apartment before the murder, evidence that Morrison used alcohol and drugs on the day of the murder and had a history of alcohol and drug abuse that compromised his cognitive abilities, and evidence that Brown may have had a relationship with the victim would have created a different result at trial. Given the evidence presented at trial, including Morrison's written statement to the police, Morrison cannot demonstrate prejudice such that our confidence in the outcome is undermined.

Accordingly, we reverse the postconviction court's granting of a new guilt phase on this issue.

### C. Ineffective Assistance of Counsel Regarding Trial Counsel's Penalty Phase Investigation

The third issue presented in the State's appeal is whether the postconviction court erred in finding that trial counsel Eler[9] was ineffective for failing to

---

9. Chris Anderson also represented Morrison at the penalty phase. However, his performance is not at issue given the postconviction court's finding

adequately investigate and prepare for the penalty phase.  Specifically, the

postconviction court found that trial counsel was deficient for failing to adequately

investigate Morrison's mental health and social background.  The postconviction

court further found that trial counsel's failure to present such evidence at the

penalty phase resulted in prejudice.  As explained below, the postconviction court

did not err in granting relief on Morrison's ineffective assistance of counsel claim

regarding trial counsel's penalty phase investigation.

### 1. Deficient Performance

On January 12, 1997, the Public Defender's Office was appointed to

represent Morrison.  The Public Defender's Office subsequently retained Dr. Harry

Krop, a psychologist, in relevant part to evaluate Morrison for possible mitigation.

Alan Chipperfield, an assistant public defender, was briefly assigned to the penalty

phase of Morrison's case.[10]  On January 14, 1998, trial counsel was appointed to

represent Morrison after the Public Defender's Office identified a conflict and

withdrew.  The guilt phase of Morrison's trial took place from September 21-25,

1998, and the penalty phase occurred on October 8, 1998.  At the postconviction

that "Anderson's performance was reasonable given his limited role in
[Morrison's] representation."

10. Chipperfield's performance is not at issue given the postconviction
court's finding that "Chipperfield's performance was reasonable given the brevity
of his representation of [Morrison]."

- 23 -

evidentiary hearing, Morrison presented the testimony of Dr. Krop, Chipperfield, and trial counsel.

Dr. Krop testified that he first interviewed Morrison on February 19, 1997, and sent a letter to the Public Defender's Office requesting additional information—depositions, medical records, and Department of Corrections records—on February 20, 1997. Dr. Krop further testified that on October 15, 1997, he sent a fax to the Public Defender's Office in which he renewed his request for additional information, explained that he wanted to see Morrison again for a neuropsychological evaluation after reviewing the previously requested depositions, and requested to interview Morrison's local family members. According to Dr. Krop, he was not contacted by any of Morrison's attorneys from October 15, 1997, until September 29, 1998—nine days before the penalty phase— when trial counsel contacted him. Dr. Krop interviewed Morrison for the second time on September 29, 1998. Dr. Krop subsequently gave a deposition[11] on October 7, 1998, which was presented to the jury at the penalty phase. Dr. Krop

_____

11. Dr. Krop informed the penalty phase jury through the videotaped deposition that Morrison received a neuropsychological evaluation on February 12, 1997. Dr. Krop also informed the penalty phase jury that he interviewed Morrison on two separate occasions. Dr. Krop found Morrison to have a full scale IQ of 78 and substance abuse problems. Dr. Krop further opined that Morrison's borderline IQ and abuse of alcohol and cocaine would affect his judgment. Although Dr. Krop observed some deficits, he did not find any conclusive evidence of organic brain damage, significant neurological impairment, or neurological diseases.

did not get any of the materials he requested until the deposition and then it was merely Morrison's school psychology report and the telephone number of Morrison's mother, who he interviewed briefly prior to the deposition. As Dr. Krop explained: "Pretty much everything from the point that [trial counsel] got involved was last minute."

Chipperfield testified that his involvement in Morrison's case was "minimal." Chipperfield authored a two-page, handwritten note, "suggesting possible aggravators and mitigators." Among other things, Chipperfield's notes indicated that Morrison was "seeing [Dr.] Krop" and that Morrison's former fiancée "may be [a] good source of info[rmation]." The notes specifically identified Allen as Morrison's former fiancée and Willie Morrison as Morrison's brother. Chipperfield testified that the "investigation for the penalty phase was in no way complete when [trial counsel] came on board." According to Chipperfield, the penalty phase was "absolutely not" ready for trial when the Public Defender's Office withdrew from the case. As Chipperfield explained: "I would not have wanted to go to a penalty phase with what we had there. It wasn't -- wouldn't have been any good."

In preparation for the postconviction evidentiary hearing, trial counsel reviewed copies of the four boxes of materials that apparently constituted his case file. These boxes included materials that he received from the Public Defender's

Office.  Trial counsel testified that when he was appointed to represent Morrison, "there was basically nothing left to do but try the case."  Trial counsel believed that the Public Defender's Office had substantially completed the investigation of Morrison's case:

> And what I remember now from having looked at the file, they had completed virtually every aspect of the investigation in the case. . . . [I]t looked like to me, based on reviewing the four boxes that were copies, that -- that their trial -- their file in December was ready for trial, had been thoroughly investigated.

As trial counsel explained:

> I believe the bulk -- I believe the bulk of the investigation and work was done by the Public Defender's Office.  And I say that with great confidence because I looked at the four boxes, and, I mean, I copied some things out of my file that were clearly Mr. Chipperfield's notes.

Trial counsel "rel[ied] on Dr. Krop" during the penalty phase and primarily relied on Chipperfield's notes, relating to the penalty phase, to formulate a mitigation strategy:

> I'm further looking at Mr. Chipperfield's notes who has itemized every bit of mitigation and aggravation in this case that I have. . . .  I mean, he -- well, it's a page or two, but knowing Mr. Chipperfield, I mean, he's got -- and it's not the end-all stop of mitigation investigation, but it was an outline that I utilized.  I found [the notes] to be complete and, I mean, he's got information on here regarding Williams Rule evidence, about the knife collection, everything that now refreshes my recollection as to their thorough investigation in the case.

We conclude that the postconviction court correctly found that Morrison's trial counsel was deficient for failing to adequately investigate and prepare for the

penalty phase. It is apparent from the record that trial counsel performed almost no investigation of Morrison's mental health and social background in preparation for the penalty phase in Morrison's case. As the postconviction court explained: "[Trial counsel] misguidedly believed [Morrison's] case was ready for trial when he was assigned to represent [Morrison]." Trial counsel unreasonably failed to provide Dr. Krop with the requested additional information necessary to adequately assess Morrison's case for mitigation. As the postconviction court explained: "Although [trial counsel] testified he relied on Dr. Krop [to address mental health mitigation], he admittedly did not investigate the doctor's involvement in [Morrison's] case. Doing so would have revealed Dr. Krop's request for more information." Trial counsel unreasonably relied primarily on Chipperfield's notes to formulate a mitigation strategy for Morrison's case. As the postconviction court explained: "Chipperfield's notes amount to no more than a very cursory attempt to come up with ideas for mitigation. There is nothing to show a well thought out strategy based on a reasonable investigation as characterized by [trial counsel]." There were sufficient facts in this case to place trial counsel on notice that further investigation of mental health and social background mitigation was necessary. Consequently, trial counsel's failure to investigate this line of defense was not reasonable under prevailing professional norms. We thus agree with the postconviction court that trial counsel's

"unreasonable lack of preparation and investigation for [Morrison's] penalty phase" constituted deficient performance.

## 2. Prejudice

In its sentencing order, the trial court found four aggravating factors, no statutory mitigation, and some nonstatutory mitigation. The four aggravating factors found by the trial court were:

> (1) Morrison was previously convicted of a felony involving the use or threat of violence to the person; (2) the crime for which Morrison was to be sentenced was committed while he was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit the crime of armed robbery or burglary with an assault or both; (3) the crime for which Morrison was to be sentenced was especially heinous, atrocious, or cruel; and (4) the victim of the capital felony was particularly vulnerable due to an advanced age or disability.

Morrison, 818 So. 2d at 456-57 (footnote omitted). The nonstatutory mitigation found by the trial court included:

> Morrison's low intellectual ability combined with drug and alcohol abuse would result in exercise of bad judgment. . . . Morrison's good jail conduct; the fact that there was no parole or other release available to Morrison; Morrison's cooperation with police; Morrison's abuse of alcohol and use of cocaine; Morrison's employment; Morrison's assumption of familial responsibility at an early age; and Morrison's positive adjustment while incarcerated.

Id. at 457.

At the postconviction evidentiary hearing, Morrison presented the testimony of a number of experts to establish the existence of mental health mitigating

evidence. Morrison's experts presented substantial mental health mitigating evidence, including evidence of Morrison's adaptive deficits, organic brain damage, and brain injuries. Morrison also presented the testimony of numerous family members and friends to establish mitigating evidence of Morrison's social background. These witnesses presented substantial mitigating evidence, including evidence of Morrison's premature birth, childhood abuse, deprived childhood, and parents' divorce. Evidence regarding Morrison's childhood abuse was described as "especially disturbing" by the postconviction court, and undoubtedly called into question the penalty phase portrayal of Morrison's "positive" family background. Georgia Morrison testified extensively at the postconviction evidentiary hearing about how she physically and verbally abused Morrison when he was young. Morrison presented evidence—through Georgia and other witnesses—that Georgia frequently beat her children with garden hoses cut in half, extension cords, belts, mops, brooms, and switches. Willie Morrison explained that Georgia would also beat her children in a particularly brutal manner: "She take you in the bathroom, you know what's fixing to happen, she's fixing to put like three inches of water in the tub and pour rubbing alcohol on you and tell you to lay down in the tub and she going to whip you until her arm get tired." Morrison presented evidence that Georgia would lock Morrison in the closet for extended periods of time as

punishment and verbally abuse him by calling him "[s]tupid, crazy, retarded, bastard," and other cruel names.

We conclude that the postconviction court correctly found that Morrison was prejudiced by trial counsel's failure to present evidence at the penalty phase. The mental health and social background evidence presented by Morrison at the postconviction evidentiary hearing is compelling mitigation. Morrison presented evidence of his: (1) adaptive deficits; (2) organic brain damage;[12] (3) brain injuries; (4) premature birth;[13] (5) childhood abuse; (6) deprived childhood; and (7) parents' divorce. Notably, evidence of Morrison's childhood abuse—which the postconviction court characterized as "especially disturbing"—was not presented to the jury. Cf. State v. Bright, 200 So. 3d 710, 734 (Fla. 2016) ("The incomplete picture the jury was presented during trial here notably omitted Bright's history of . . . rampant and violent beatings [with an electrical cord, leather belt, or

---

12. Although Dr. Krop's penalty phase deposition informed the jury that he did not find any conclusive evidence of organic brain damage, that finding is not dispositive because trial counsel failed to provide Dr. Krop with the requested additional information necessary to adequately assess Morrison's case for mitigation.

13. Although Morrison's mother Georgia testified at the penalty phase that her son was born healthy, trial counsel was still deficient for failing to adequately investigate Morrison's social background.

hand].”). Although the aggravators in this case are weighty, there is a reasonable probability that the presentation of this additional mitigating evidence would have resulted in a different result at the penalty phase. See, e.g., Salazar v. State, 188 So. 3d 799, 817 (Fla. 2016) (“Weighing the mitigating evidence described above of Salazar’s low IQ scores, adaptive deficits, head injuries, and family history presented during the postconviction proceeding, combined with the mitigating evidence presented at the penalty phase against the evidence in aggravation, there is a reasonable probability that presenting the additional mitigation would lead to a different result.”); Griffin v. State, 114 So. 3d 890, 909 (Fla. 2013) (“Had the trial judge been presented with evidence about the severity of Griffin’s drug use, his use of drugs at the time of the crimes, his family history of alcohol and drug abuse and mental illness, his history of depression, and the impact of his prior brain injury, there is a reasonable probability that the result of the penalty phase proceeding would have been different.”).

We therefore affirm the postconviction court’s granting of a new penalty phase on this issue.

### III. MORRISON’S CROSS-APPEAL

### A. Brady

The first issue presented in Morrison’s cross-appeal is whether the postconviction court erred in denying Morrison’s Brady claims. Morrison claims

that the State violated <u>Brady</u> by suppressing evidence of: (1) an unused condom found in the victim's shirt pocket; (2) Officer Richardson's conversation with Brown; (3) Detective Davis's handwritten notes; (4) Wright's statements to law enforcement; and (5) Morrison's drug use at the time of arrest. As explained below, the postconviction court did not err in denying Morrison's <u>Brady</u> claims.

"To establish a <u>Brady</u> violation, the defendant has the burden to show that: (1) the evidence was either exculpatory or impeaching; (2) the evidence was willfully or inadvertently suppressed by the State; and (3) because the evidence was material, the defendant was prejudiced." <u>Davis v. State</u>, 136 So. 3d 1169, 1184 (Fla. 2014). "To meet the materiality prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed, the jury would have reached a different verdict." <u>Id.</u> at 1185. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> "The cumulative effect of the suppressed evidence must be considered when determining materiality." <u>Way v. State</u>, 760 So. 2d 903, 913 (Fla. 2000). "In reviewing a <u>Brady</u> claim, 'this Court defers to the factual findings made by the trial court to the extent they are supported by competent, substantial evidence, but reviews de novo the application of those facts to the law.' " <u>Johnson v. State</u>, 135 So. 3d 1002, 1028 (Fla. 2014) (quoting <u>Lightbourne v. State</u>, 841 So. 2d 431, 437 (Fla. 2003)).

- 32 -

Morrison claims that the State violated <u>Brady</u> by suppressing evidence of an unused condom found in the victim's shirt pocket. However, Morrison's <u>Brady</u> claim fails to meet the first prong of <u>Brady</u>. As the postconviction court found: "[Morrison] fails to establish [the victim] planned to have sexual relations with Ms. Brown the night of the murder. Even if Ms. Brown was a prostitute, [Morrison's] ultimate conclusion that a condom in [the victim's] shirt pocket means Ms. Brown killed [the victim] is rank speculation and, thus, does not merit relief." We conclude that competent, substantial evidence supports the postconviction court's finding that Morrison failed to present any evidence connecting Brown to the condom. Because we are remanding for a new penalty phase proceeding, we decline to address whether evidence of the condom could have been used to rebut the State's penalty phase theory that the victim was a feeble recluse.

Morrison claims that the State violated <u>Brady</u> by suppressing evidence of Officer Richardson's conversation with Brown in which he purportedly used threats to coerce her cooperation with law enforcement. However, Morrison's <u>Brady</u> claim fails to meet the first prong of <u>Brady</u>. Although Tims testified at the postconviction evidentiary hearing that she overheard Officer Richardson threaten Brown to "cooperate," the record indicates that this meant following Officer Richardson's instructions not to talk to anyone about the murder. As the postconviction court found:

Ms. Tim[s'] testimony illustrates Ms. Brown's fear of consequences if she did not follow [Officer Richardson's] instructions not to talk to anyone about the murder. It does not show that Officer Richardson threatened Ms. Brown to cooperate when she made her statement. . . . There is no evidence of Officer Richardson threatening Ms. Brown so as to lead her to testify untruthfully at [Morrison's] trial.

We conclude that competent, substantial evidence supports the postconviction court's finding.

Morrison claims that the State violated Brady by suppressing evidence of Detective Davis's handwritten notes in which he purportedly identified Brown as a suspect. This claim is procedurally barred because Morrison did not raise it in his amended postconviction motion. See Hitchcock v. State, 991 So. 2d 337, 349 (Fla. 2008) ("This argument is procedurally barred because Hitchcock did not raise it in his postconviction motion.").

Morrison claims that the State violated Brady by suppressing evidence of Wright's statements to law enforcement that she purportedly saw and talked with Morrison in Marietta on the night of the murder. This claim is entirely misplaced because no one was in a better position to know if Wright saw and talked with Morrison in Marietta on the night of the murder than Morrison himself. See Occhicone v. State, 768 So. 2d 1037, 1042 (Fla. 2000) ("[A] Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from

the defendant.").

Morrison claims that the State violated Brady by suppressing evidence of Morrison's purported drug use at the time of arrest. We reject this claim because no one was in a better position to know if Morrison used drugs at the time of his arrest than Morrison himself. See id. As the postconviction court found: "This information was equally accessible to [Morrison] and to the State." We conclude that competent, substantial evidence supports the postconviction court's finding.

In any event, even assuming that all five pieces of evidence constitute Brady material, Morrison could not demonstrate prejudice under a cumulative materiality analysis.

We therefore affirm the postconviction court's denial of Morrison's Brady claims.

### B. Newly Discovered Evidence

The second issue presented in Morrison's cross-appeal is whether the postconviction court erred in denying Morrison's newly discovered evidence claims regarding: (1) DNA evidence obtained from the knife handle of the murder weapon and (2) Brown's posttrial admission to Tims. As explained below, the postconviction court did not err in denying Morrison's newly discovered evidence claims.

A defendant must satisfy a two-prong test in order to obtain relief on the basis of newly discovered evidence:

> First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.

Marek v. State, 14 So. 3d 985, 990 (Fla. 2009). "Newly discovered evidence satisfies the second prong of this test if it 'weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.'" Henry v. State, 125 So. 3d 745, 750 (Fla. 2013) (alteration in original) (quoting Heath v. State, 3 So. 3d 1017, 1023-24 (Fla. 2009)). In determining whether a new trial is warranted, the reviewing court "must consider the effect of the newly discovered evidence, in addition to all of the admissible evidence that could be introduced at a new trial." Hildwin v. State, 141 So. 3d 1178, 1184 (Fla. 2014) (citing Swafford v. State, 125 So. 3d 760, 775-76 (Fla. 2013)). "When a postconviction court rules on a newly discovered evidence claim after an evidentiary hearing, this Court will affirm those determinations that involve findings of fact, the credibility of witnesses, and the weight of the evidence provided they are supported by competent, substantial evidence." Brooks v. State, 175 So. 3d 204, 231 (Fla. 2015).

Morrison presented evidence at the postconviction evidentiary hearing that DNA testing of the knife handle of the murder weapon revealed DNA from an

unknown person and excluded Morrison and the victim as contributors. However, the DNA evidence obtained from the knife handle of the murder weapon is not newly discovered because Morrison or Morrison's trial counsel could have known of it by the use of due diligence. Morrison actually knew about the knife at the time of trial and could have requested DNA testing of the knife handle prior to trial. Although Morrison argues that the DNA evidence is newly discovered because it was not "routine" to conduct DNA testing of knife handles at the time of his trial, this argument lacks merit. Morrison has failed to demonstrate that the DNA evidence could not have been obtained at the time of trial through DNA testing methods or techniques existing at the time of trial. See Wyatt v. State, 71 So. 3d 86, 100 (Fla. 2011) (explaining that this Court has "recognized newly discovered evidence claims predicated upon new testing methods or techniques that did not exist at the time of trial, but are used to test evidence introduced at the original trial").

Brown's posttrial admission to Tims is newly discovered. However, the postconviction court found that the newly discovered evidence does not demonstrate that Brown lied at trial:

> [M]s. Tim[s] testified at the evidentiary hearing she had a
> conversation with Ms. Brown after the trial. According to Ms.
> Tim[s], Ms. Brown said she testified because the officer threatened to
> take her to jail and take her child from her if she did not cooperate. . . .
> Even if this is true, there is no evidence Ms. Brown's trial testimony

- 37 -

was untruthful; there is only evidence that Ms. Brown did not want to cooperate with law enforcement.

(Footnote omitted.) We conclude that competent, substantial evidence supports the postconviction court's finding. We further conclude that the newly discovered evidence would not probably produce an acquittal on retrial even when it is considered cumulatively with all of the admissible evidence that could be introduced at a new trial.

We therefore affirm the postconviction court's denial of Morrison's newly discovered evidence claims.

## C. Intellectual Disability

The third issue presented in Morrison's cross-appeal is whether the postconviction court erred in denying Morrison's intellectual disability claim. To prevail on a claim of intellectual disability, a defendant must establish three elements: (1) significantly subaverage general intellectual functioning (2) existing concurrently with deficits in adaptive behavior and (3) manifesting prior to age 18. § 921.137(1), Fla. Stat. (2015); see also Fla. R. Crim. P. 3.203. "If the defendant fails to prove any one of these components, the defendant will not be found to be intellectually disabled." Snelgrove v. State, 217 So. 3d 992, 1002 (Fla. 2017) (quoting Salazar, 188 So. 3d at 812).

"[T]his Court has never held that the defendant must have been given a

specific IQ test prior to the age of 18 in order to find an intellectual disability."
Oats v. State, 181 So. 3d 457, 469 (Fla. 2015). However, "a defendant [must still] demonstrate that his 'intellectual deficiencies manifested while he was in the "developmental stage"—that is, before he reached adulthood.' " Id. at 468 (quoting Brumfield v. Cain, 135 S. Ct. 2269, 2282 (2015)).

In its order, the postconviction court discussed the standard for intellectual disability and Hall v. Florida, 134 S. Ct. 1986 (2014). The postconviction court subsequently analyzed the merits of Morrison's intellectual disability claim:

> [T]he medical experts report [Morrison's] IQ scores are: 78 (1976); 78 (1997); 79 (2008); and 70 (2012). Although [Morrison's] score of 70 is certainly within the range of subaverage intellectual functioning, [Morrison] did not achieve this score until he was more than forty-years old. The only score that satisfies the third prong of intellectual disability—onset before the age of eighteen—is [Morrison's] score in 1976 when he was eight-years old.

At the postconviction evidentiary hearing, Morrison was afforded a full opportunity to present evidence on each of the three elements of the intellectual disability standard. After taking into account Hall and considering all three prongs of the intellectual disability test in tandem, the postconviction court found that Morrison was not entitled to relief on his intellectual disability claim because he failed to prove the third prong. We affirm the postconviction court's denial of Morrison's intellectual disability claim. Morrison did not prove manifestation of significantly subaverage general intellectual functioning prior to age 18.

- 39 -

## D. Cumulative Error

The final issue that we address in Morrison's cross-appeal is Morrison's contention that errors demonstrated in the proceedings below cumulatively entitle him to a new guilt phase. "Where several errors are identified, the Court 'considers the cumulative effect of evidentiary errors and ineffective assistance [of counsel] claims together.' " Diaz v. State, 132 So. 3d 93, 118 (Fla. 2013) (alteration in original) (quoting Hurst, 18 So. 3d at 1015). However, "[i]t is well established that 'where individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail.' " Mendoza v. State, 87 So. 3d 644, 657 (Fla. 2011) (quoting Griffin v. State, 866 So. 2d 1, 22 (Fla. 2003)). "In addition, individual claims that fail to meet the Strickland standard for ineffective assistance of counsel are also insufficient to establish cumulative error." Bright, 200 So. 3d at 742. Moreover, claims of error that have previously been presented to this Court on direct appeal or in postconviction and subsequently rejected cannot form the basis for a valid claim of cumulative error. See Rogers v. State, 957 So. 2d 538, 555-56 (Fla. 2007) (citing Morris v. State, 931 So. 2d 821, 837 n.14 (Fla. 2006); Melendez v. State, 718 So. 2d 746, 749 (Fla. 1998)). Because Morrison has failed to establish that any guilt phase errors occurred that either individually or cumulatively would entitle him to a new guilt phase, we deny relief on this claim.

# IV. CONCLUSION

Based on the foregoing, we reverse the portion of the postconviction court's order granting Morrison a new guilt phase, affirm the portions of the postconviction court's order granting Morrison a new penalty phase and denying Morrison's other asserted grounds for postconviction relief, and deny Morrison's claim of guilt phase cumulative error. Accordingly, we vacate the death sentence and remand this case for a new penalty phase.

It is so ordered.

LABARGA, C.J., and LEWIS, QUINCE, CANADY, POLSTON, and LAWSON, JJ., concur.
PARIENTE, J., concurs in part and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

PARIENTE, J., concurring in part and dissenting in part.

I concur that Morrison is entitled to a new penalty phase. But I dissent from the majority's denial of a new evidentiary hearing on Morrison's intellectual disability claim. The postconviction court improperly relied solely on Morrison's IQ score of 78 when he was eight years old to conclude that Morrison did not meet the third prong of the intellectual disability test—that the intellectual disability manifested before the age of eighteen—and was, therefore, not intellectually disabled. Taking into consideration the significant amount of testimony offered during the postconviction evidentiary hearing indicating that Morrison's

- 41 -

intellectual disability manifested prior to the age of eighteen, I would err on the side of caution and grant Morrison an opportunity to prove that he is intellectually disabled at a hearing conducted pursuant to this Court's decision in Oats v. State, 181 So. 3d 457 (Fla. 2015), which emphasized that " 'manifested' [does not] equate[] to 'diagnose[],' " id. at 469, and was a decision the postconviction court did not have the benefit of when it denied Morrison's intellectual disability claim.

The postconviction court found that Morrison could not be intellectually disabled solely because he obtained an IQ score of 78 on an intellectual disability test administered when Morrison was eight years old. In doing so, the postconviction court felt compelled to conclude that Morrison was not intellectually disabled, despite the expert and layperson testimony tending to prove that, despite the IQ score of 78, Morrison showed signs of intellectual disability before the age of eighteen. In fact, the trial court stated that its decision was based on the IQ score "despite significant deficits in adaptive functioning" before the age of eighteen.

The postconviction court denied Morrison's intellectual disability claim, stating:

> [T]he medical experts report [Morrison's] IQ scores are: 78 (1976); 78 (1997); 79 (2008); and 70 (2012). Although [Morrison's] score of 70 is certainly within the range of subaverage intellectual functioning, [Morrison] did not achieve this score until he was more than forty years old. The only score that satisfies the third prong of intellectual

- 42 -

disability—onset before the age of eighteen—is [Morrison's] score in 1976 when he was eight-years old.

This [c]ourt is constrained by caselaw and statute not to declare [Morrison] intellectually disabled despite significant deficits in adaptive functioning. [Morrison] is not entitled to relief on [his intellectual disability claim].

The above order, including its cursory analysis, demonstrates the postconviction court's failure to provide Morrison with the constitutionally required holistic review of his intellectual disability claim. See Walls v. State, 213 So. 3d 340, 346 (Fla. 2016), cert. denied, 2017 WL 2654649 (2017). In Hall v. Florida, 134 S. Ct. 1986 (2014), which the postconviction court discussed in its order, the United States Supreme Court made clear that sentencing courts should "consider . . . substantial and weighty evidence of intellectual disability as measured and made manifest by the defendant's failure or inability to adapt to his social and cultural environment, including medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances. . . . [T]he medical community accepts that all of this evidence can be probative of intellectual disability, including for individuals who have an IQ test score above 70." Id. at 1994.

Morrison presented numerous lay witnesses in support of his intellectual disability claim. Collectively, these witnesses testified that Morrison was born prematurely, was mentally slow from a young age, had trouble performing simple tasks such as picking up items from the store and preparing food, and generally

- 43 -

required assistance. To this effect, Joseph Turner, a childhood friend, testified that other children made fun of Morrison when he was growing up because "he wasn't up to . . . speed with the regular kids," and Morrison would howl at the moon and scream for hours as a child. Irving Huffingham, the principal of Morrison's elementary school, testified that Morrison was referred for special testing and evaluation because his teachers saw something concerning in his performance. Huffingham further testified that Morrison tested in the "top end of the borderline range of [intellectual disability]." Morrison's school records indicated that Morrison dropped out of school when he was sixteen years old, having only reached the seventh grade.

At the postconviction evidentiary hearing, Morrison also presented numerous expert witnesses in support of his intellectual disability claim. For example, Dr. Gordon Taub administered the WAIS-IV to Morrison in March 2012. Dr. Taub believed that Morrison's full-scale IQ score of 70 on the WAIS-IV was valid and reliable. Dr. Eisenstein testified that he concluded that Morrison is intellectually disabled because he has deficits in intellectual functioning and deficits in adaptive functioning, which existed before Morrison reached the age of 18. Dr. Eisenstein explained that Morrison's academic difficulties and consistent academic failures constituted evidence that his intellectual disability existed prior to age 18. Dr. Eisenstein testified that he would categorize Morrison's impairment

"between moderate to extreme." Dr. Krop testified that Morrison's school records suggested that he suffered from intellectual deficiencies.

In Hall, the United States Supreme Court held that Florida's interpretation of section 921.137(1), Florida Statutes (2013), as establishing a strict IQ score cutoff of 70, "create[d] an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." 134 S. Ct. at 1990. The United States Supreme Court recognized in Hall that, based on a consensus within the medical community, the manifestation prong of the intellectual disability test simply requires the "onset of these deficits during the developmental period." Id. at 1994; see Brumfield v. Cain, 135 S. Ct. 2269, 2282 (2015) (indicating that this prong requires the defendant to demonstrate that intellectual deficiencies manifested "before he [or she] reached adulthood"). Indeed, in describing the manifestation prong, we have expressly rejected the notion that manifestation of an intellectual disability prior to the age of 18 "equates to [a] 'diagnos[is]' " of an intellectual disability because "the only way to find an intellectual disability would [then] be if the diagnosis already existed by the age of 18." Oats, 181 So. 3d at 469. Consistent with this description of the manifestation prong, the Court also held that a determination of intellectual disability is a "conjunctive and interrelated assessment" such that no single factor can be considered dispositive. Id. at 459 (quoting Hall, 134 S. Ct. at 2001).

After <u>Hall</u> and the postconviction court's order in this case, in <u>Oats</u>, this Court echoed <u>Hall</u>, stating: "[A]s the Supreme Court has now recognized, because these factors are interdependent, if one of the prongs is relatively less strong, a finding of intellectual disability may still be warranted based on the strength of other prongs." <u>Id.</u> at 467-68 (citing <u>Hall</u>, 134 S. Ct. at 2001). This Court made clear that "courts must consider all three prongs in determining an intellectual disability, as opposed to relying on just one factor as dispositive." <u>Id.</u> at 467. Thus, every intellectual disability claim must be given a "holistic review." <u>Walls</u>, 213 So. 3d at 346.

As I have previously stated:

More than fundamental fairness and a clear manifest injustice, the risk of executing a person who is not constitutionally able to be executed, trumps any other considerations that this Court looks to when determining if a subsequent decision of the United States Supreme Court should be applied. At stake in this case is a principle that could not be better expressed than in the words of Justice Kennedy writing for the majority in <u>Hall</u>:

The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution. Florida's law contravenes our Nation's commitment to dignity and its duty to teach human decency as the mark of a civilized world. The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects.

<u>Walls</u>, 213 So. 3d at 348-49 (Pariente, J., concurring).

The significant amount of testimony offered during the postconviction hearing indicates that Morrison's intellectual disability manifested prior to the age of eighteen. However the postconviction court discounted this evidence of "significant deficits in adaptive functioning" focusing solely on Morrison's one childhood IQ score that fell outside the test's margin of error. Thus, I would give Morrison the opportunity to prove that he is intellectually disabled at a hearing conducted pursuant to this Court's opinion in Oats. Accordingly, I dissent from the majority's denial of Morrison's claim that he is entitled to a new evidentiary hearing on his claim of intellectual disability.

An Appeal from the Circuit Court in and for Duval County,
    Henry Elisha Davis, Judge - Case No. 161997CF000991AXXXMA

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, Florida,

    for Appellant/Cross-Appellee

Linda McDermott of McClain & McDermott, P.A., Estero, Florida,

    for Appellee/Cross-Appellant